SOUTHWESTERN ELECTRIC POWER COMPANY (Formerly Southwestern Gas and Electric Company)

v.

The UNITED STATES.

No. 45–58.

United States Court of Claims.

Jan. 11, 1963.

Davis, J., dissented in part.

**438**

Richard L. Arnold, Texarkana, Ark., for plaintiff; John M. Madison, Shreveport, La., and Stevenson, Dendtler & McCabe, Chicago, Ill., on the briefs.

Robert Livingston, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant; Edward S. Smith and Philip R. Miller, Washington, D. C., on the brief.

LARAMORE, Judge.

This is an action to recover the amounts of income tax deficiencies and interest thereon, totaling $15,847.39, which the plaintiff was required by the Internal Revenue Service to pay for the calendar years 1947, 1948, 1949, and for the period January 1–October 20, 1950.

The legal question involved in this action is whether certain advertising expenses and certain legal and traveling expenses of the plaintiff during the respective periods constituted "ordinary and necessary expenses paid or incurred * * * in carrying on * * * [the plaintiff's] business," within the meaning of that phrase as used in section 23. (a) (1) (A) of the Internal Revenue Code of 1939, as amended 26 U.S.C. § 23 (a) (1) (A) (1952 Ed.).[1]

A corollary question is whether by virtue of section 29.23(q)–1 of U.S. Treasury Department, Income Tax Regulations 111 (26 CFR § 29.23(q)–1 (1949 Ed.)), said advertising, legal and traveling expenses, or any of them were nondeductible from gross income under section 23(a) (1) (A), supra.

---

1. Section 23(a) (1) (A), supra, provides in pertinent part:

"(A) *In general.* All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * *."

The Treasury Regulation in question provides in pertinent part that sums of money expended for lobbying purposes, the promotion or defeat of legislation, the exploitation of propaganda, including advertising other than trade advertising, and contributions for campaign expenses are not deductible from gross income.

The facts briefly summarized are as follows: The plaintiff, a Delaware corporation, had its principal business office, during the years involved, in the City of Shreveport, Louisiana. It was engaged in the generation, transmission, distribution and sale of electric power and energy in an area covering northeastern Texas, northwestern Louisiana, and a portion of southern and western Arkansas. In that area plaintiff, during the pertinent periods, furnished electric utility service at retail in approximately 154 cities, towns and unincorporated communities and in rural areas adjacent thereto. It also sold electric power to 3 municipalities and 13 rural electric cooperatives for resale. Plaintiff owned and operated various steam electric generating stations, electric distributing systems, and a transmission system.

Background for the present controversy was provided when the Congress of the United States, during the period between June 28, 1938, and March 2, 1945, authorized or approved the construction and operation by the Corps of Engineers, United States Army, under the control of the War Department, of 13 reservoir projects and hydroelectric power facilities located in the area that includes the States of Arkansas and Louisiana, those parts of the States of Kansas and Missouri lying south of the Missouri River basin and east of the 98th meridian, and those parts of the States of Texas and Oklahoma lying east of the 99th meridian and north of the San Antonio River basin. In addition, Congress during the same period authorized the Corps of Engineers to survey and report on the feasibility of 16 additional proposed reservoir projects and hydroelectric facilities in such area.

The territory served by the plaintiff (see finding 7(a)) is within the area described in finding 9. The authorized and proposed hydroelectric power projects referred to in finding 9 were all located or to be located in, or within transmission distance of, the territory served by the plaintiff. The aggregate hydroelectric generating capacity proposed to be installed in such Federal projects was about 2,000,000 kilowatts.

During the period in question, on the basis of the reports of the Army Engineers, plaintiff believed that the power generated at the Federal projects in the area would be sold to existing electric systems. However, under section 5 of the Act of December 22, 1944 (the Flood Control Act of 1944), 58 Stat. 887, the Secretary of the Interior was authorized to sell such power in wholesale quantities at rates to be approved by the Federal Power Commission, and to construct or acquire, from funds appropriated by Congress, transmission lines and related necessary facilities. The Southwestern Power Administration was designated as the marketing agent under section 5 of the Act of December 22, 1944, supra.[2]

In November of 1945 the Southwestern Power Administration issued a "Report on Comprehensive Plan of Power Distribution and Sales from Hydro-Electric Projects, as Authorized by Flood Control Act, December 1944 (H.R. 4485) in the Southwestern Region." This was a proposal for possible future action with respect to the construction and operation of a comprehensive electric system within a substantial portion of the southwestern area of the country. The Plan proposed the sale in wholesale quantities of firm power to public bodies, rural electric cooperatives, and privately owned companies.

The comprehensive plan was brought to the attention of plaintiff on or about February 2, 1946, and it was apparent

2. The Southwestern Power Administration is a bureau or agency of the Department of the Interior. It was created by Order No. 1865, which the Secretary of the Interior issued on August 31, 1943.

that if the facilities embraced therein were constructed and operated, it would constitute a competitive system with that of plaintiff. The plaintiff was concerned that the cities and towns would decide to go into the power business and either build distribution systems or acquire those owned by plaintiff. The plaintiff considered this to be a serious threat to its business.

The plaintiff's concern was increased by reports it received to the effect that representatives of the Southwestern Power Administration had approached certain municipal authorities and had tried to interest them in public power and in substituting electric service from the Southwestern Power Administration for the electric service rendered by the plaintiff. In fact, during the periods involved in this case, the Southwestern Power Administration began furnishing electric service to three rural electric cooperatives which were located in plaintiff's service area and which had previously obtained power from the plaintiff.

In an attempt to develop a spirit of opposition toward the implementation of the Southwestern Power Administration's comprehensive plan, plaintiff began a series of advertisements in newspapers and magazines which circulated primarily in such service area. In their totality, these advertisements endeavored to make the following principal points:

"The Government, through the Southwestern Power Administration, was planning to spend $200,-000,000 of the taxpayers' money to build a power system that would duplicate the lines of electric light companies already serving more than 800,000 houses in Missouri, Kansas, Oklahoma, Arkansas, Louisiana, and Texas.

"The plaintiff was building to serve every future need of electric power in its territory. There was no need, and there never would be a need, for the Southwestern Power Administration to waste the taxpayers' money for service already sup-

plied by the plaintiff, a taxpaying business.

"The plaintiff and other electric power companies operating in the areas where Federal flood-control dams were located or to be located should be permitted to purchase and distribute any power generated at those projects, because such companies already had the lines and other distribution facilities.

"It is unfair for the Government to compete with electric power companies in the generation and distribution of electric power, because electric power companies are required to pay a fair return to their investors, to pay taxes, and to pay adequate interest on loans, whereas the Government does not meet such requirements.

"The Government shifts its losses to the taxpayers. In the power business, it can pretend to sell cheap power and cover up its losses.

"When the Government takes over enough things, socialism comes automatically. Socializing electric light and power is one of the first goals of people who want to push America down the hill to socialism.

"Government ownership of electric power companies is contrary to the American system of free business enterprise."

These advertising expenses are the same, and in part, are the subject of this litigation.

During the periods here involved, representatives of plaintiff, plaintiff's president, vice president, and general counsel, in cooperation with other electric power companies, also appeared before subcommittees of the Appropriations Committees of the House of Representatives and Senate of the United States. In these appearances an attempt was made to persuade said committees not to grant requests for funds to be used by the Southwestern Power Administration for purposes of the agency's comprehensive plan. In addition, an attempt was made to persuade committees not to grant De-

partment of Agriculture requests for funds to be used by the Rural Electrification Administration in making loans to certain rural electric cooperatives for construction of steam electric generating stations and transmission lines. The attempt to dissuade the appropriations committees was based largely upon the legality of proposed appropriations.

Plaintiff, in addition to advertising expenses and travel expenses, incurred and paid legal fees to its general counsel, Richard L. Arnold, as compensation for his services in preparing and submitting legal opinions to subcommittees and expenses incident to his attending committee hearings for the purpose of giving testimony.

Plaintiff timely filed its corporation income tax returns for the calendar years 1947, 1948, 1949, and for a part of 1950, and paid the taxes shown to be due. After examination, the Internal Revenue Service made certain adjustments, not here involved, and assessed a deficiency.

In determining the deficiency, the Internal Revenue Service disallowed as deductions from plaintiff's gross income the advertising expenses, legal and travel expenses, which are referred to herein.

Plaintiff paid the assessed deficiencies and timely filed claims for refund which were denied. This suit results.

Since two types of deductions are claimed here, we will treat each separately.

■ The first claimed deduction is for the cost of advertising. As stated earlier, the law does not allow a deduction from gross income for expenditures incurred for lobbying purposes, the promotion or defeat of legislation, the exploitation of propaganda, including advertising other than trade advertising and contributions for campaign expenses. The nondeductibility of these items stems from section 29.23(q)–1 of Treasury Regulations 111, supra, the legality of which was upheld most recently by the

Supreme Court in the case of Cammarano v. United States, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462. In that case, the issue was the deductibility of expenses incurred by Cammarano in an effort to persuade voters to cast their ballots against proposed state initiative legislation which would have seriously affected or wholly destroyed the taxpayer's business. Therein the Supreme Court held that not only lobbying expenses, but also sums spent for " * * * the promotion or defeat of legislation, *the exploitation of propaganda,* including advertising other than trade advertising" are non-deductible [italic supplied]. In addition to upholding the legality of the regulations, the Supreme Court in the Cammarano case rejected as without merit the contention that the first amendment to the Constitution of the United States was violated by the denial of expenditures to purchase publicity which could influence the fate of legislation.

Plaintiff contends with respect to the constitutional question that the Supreme Court's holding was made without the extended consideration usually afforded to constitutional questions. We need only to point out that while the majority opinion in Cammarano respecting violation of the first amendment was contained in one paragraph, it was not treated in a cavalier fashion. Mr. Justice Douglas, in a concurring opinion, very exhaustingly dealt with the constitutional question and approved and upheld the constitutionality of the regulation.

True, plaintiff makes a different, intelligent and persuasive argument on this point. Yet, however meritorious the argument, we feel that the Cammarano opinion leaves no room for doubt in this field.

Referring back to the application of the Cammarano case to the facts of this case—legislation had already been passed, so we cannot categorically say that the advertisements were primarily aimed at promoting or defeating legislation.[3]

---

3. Nothing is contained in the evidence or briefs, but the possibility exists that re- peal of legislation already enacted might reasonably result from such advertising.

■ What then remains in the regulation which could deny deductibility? We think the important language is this: "* * * the exploitation of propaganda, including advertising other than trade advertising * * *."

The principal points which the advertisements were designed to make are: (1) The Government, through the Southwestern Power Administration, was planning to unnecessarily waste $200,000,000 of the taxpayers' money to build a duplicating power system; (2) there was no need for such; (3) the plaintiff should be permitted to purchase and distribute any power generated at the proposed projects; (4) it is unfair for the Government to compete with private companies; (5) the Government shifts its losses to the taxpayers and can pretend to sell cheap power and cover up its losses; (6) socialism would be the result; (7) Government ownership of electric power companies is contrary to the American system of free business enterprise.

Even though we may be heart and soul in sympathy with and in agreement with the objectives of the advertisements, nevertheless said advertisements clearly are in the nature of the exploitation of propaganda and cannot be considered as "trade advertisements". Except for plaintiff's name at the bottom of each ad, nothing is contained in any one that would induce a prospective customer to purchase plaintiff's product. For instance, picking at random, the advertisement of January 1947 is entitled, "Here's Where Your Money Goes." This ad is pointing to waste of tax money proposed to be spent by Southwestern Power Administration. The advertisement of May 5, 1947, is entitled, "Is This Waste Really Necessary?" This ad points out unfair competition by the Government. The November 1948 ad is entitled, "The way it actually works." This ad is datelined "London" and points out the danger of socialism. Thus, it can readily be seen that exploitation of propaganda is the primary objective of most, if not all, of the advertisements when viewed either individually or as a whole. They were designed to create a climate of public opinion against the proposed project, the expense deductibility of which is in direct violation of the pertinent regulations and not in conformity with the expression of the Supreme Court in Cammarano v. United States, supra.

While it may be argued that the insertion of Plaintiff's name at the bottom of each advertisement in some measure attains the form of direct customer advertising, the tenor of the advertisements, taken in their entirety, completely outweighs any determination other than that their purpose was purely the exploitation of propaganda.

■ Nor can the threat of business injury justify advertising such as here. Los Angeles & Salt Lake Railroad Co. v. Commissioner, 18 B.T.A. 168.

■ Consequently, in the light of the Supreme Court's decision upholding the validity of the regulation in question, and in the light of many decisions to the effect that deductions for advertising under section 23(a) (1) (A), supra, must be within the normal concept of advertising; i. e., promoting the sale of goods,[4] plaintiff must fail on this item of its claim.

The remainder of plaintiff's claim is based upon the deductibility or non-deductibility of certain legal and travel expenses of the plaintiff. Plaintiff's claim is based upon a contention that said expenses constitute "ordinary and necessary expenses paid or incurred * * * in carrying on * * * business," within the meaning of that phrase as is used in section 23(a) (1) (A) of the Internal Revenue Code of 1939, supra.

Defendant, of course, contends that the legal and travel expenses were incurred in an effort to defeat legislation; i. e., to defeat an appropriation bill for the im-

4. Stover Co. v. Commissioner, 27 T.C. 434; Revere Racing Association v. Scanlon, 1 Cir., 232 F.2d 816.

plementation of the Southwestern Power Administration's comprehensive plan.

While the problem of whether or not "appropriation" is "legislation" is surrounded by an aura of confusion and doubt with little or no light shed on the subject by the Federal courts, we think the resolution of that question is unnecessary to a complete disposition of this phase of the case.

The facts respecting this portion of plaintiff's claim are briefly: Plaintiff incurred legal and travel expenses in attempting, along with other electric power companies, to persuade the appropriations committees of the U. S. Senate and House of Representatives not to grant requests of the Interior Department for funds to be used by the Southwestern Power Administration for the purposes of the agency's comprehensive plan, and not to grant a request by the Department of Agriculture for funds to be used by the Rural Electrification Administration in carrying out a plan whereby the Rural Electrification Administration would make loans to certain rural electric cooperatives for construction of steam electric generating stations and transmission systems within the area of plaintiff's operations.

The plaintiff's reason for the above action was based upon its general counsel's advice that in his opinion the steam electric generating plants and the network of 14,000 miles of transmission lines proposed to be constructed by Southwestern Power Administration were not authorized by section 5 of the Act of December 22, 1944, supra.[5]

In attempting to prevent favorable action on the requests for funds, the president, vice president, and general counsel of the plaintiff engaged in travel, at the expense of plaintiff, for the purpose of appearing at hearings before a subcommittee of the respective appropriations committee, stating to said subcommittee factual and legal reasons why, in the opinion of plaintiff, the requests for funds should not be granted.

While it is true plaintiff's representatives made certain factual representations regarding the plan, we think those statements were necessary to place the situation in a climate whereby the legal problems could be approached.

In connection with these activities, plaintiff paid legal fees to its general counsel, as compensation for his service in preparing and submitting legal opinions to plaintiff and said subcommittee and in attending hearings before such subcommittee for the purpose of giving testimony himself and advising other representatives of plaintiff with respect to the formulation of statements to be submitted by them to said subcommittee, and in coordinating legal material for inclusion in said statements and in performing legal research incident to these matters.

The total legal and travel expenses amounted to $14,459.58. Of this amount, $9,500 represented fees paid plaintiff's general counsel for his legal services, $3,949.48 represented reimbursement to plaintiff's general counsel for travel expenses and $1,010.10 represented reimbursement to other representatives of the plaintiff for travel expenses.[6]

These expenses were not disallowed by the Commissioner of Internal Revenue on the ground that the expenses were not "ordinary and necessary expenses" under section 23(a) (1) (A), supra, but on the ground that they were not deductible from gross income under the provisions of section 29.23(q)–1, supra, of the regulations and, therefore, did not constitute allowable, ordinary and necessary expenses under section 23(a) (1) (A).

Thus, we must again look to the above regulation for a determination as to the application thereof. At the outset, we can cast aside certain portions of the regulation; i. .e, it was not the exploitation of propaganda, including advertising of any sort, nor was it a campaign contribution. Therefore, to come within the regulation the expenses must have been

5. This statute is frequently referred to as the Flood Control Act of 1944.

6. No question is raised as to the reasonableness of the above amounts.

either for lobbying or the promotion or defeat of legislation.

We cannot conceive in this situation that the Government strongly urges that the above recited appearances constituted lobbying on the part of the plaintiff. A mere appearance before a legislative committee cannot be construed to be "lobbying" under the statute. As a matter of fact, a mere appearance before a committee of Congress is expressly excepted from the Act. 60 Stat. 839, 842. Therefore, we hold that the appearances and statements by plaintiff's president, vice president, and general counsel in fact are not embraced by the term "lobbying".

We then must consider whether these sums were expended for the promotion or defeat of legislation, and in so doing we attempt to refrain from any expression as to whether "appropriation" is "legislation" within the meaning of the regulation in question.

We simply do not think plaintiff's representatives were paid to promote. or defeat legislation. The legislation had been passed by Congress. Indeed, as a result thereof, plaintiff was fighting for its very existence. If, as thought by plaintiff, the Southwestern Power Administration's lines could effectively destroy plaintiff's business and there was some taint of illegality in an appropriation of funds to supplement the plan, it was the duty of plaintiff's president and officers to seek legal advice in order to protect its stockholders.[7]

In furtherance of this goal, it was also the duty of plaintiff's officers to so inform the appropriations committees of Congress. In this connection, there is no evidence to the contrary and we assume neither plaintiff's president nor its vice president were lawyers, and hence it was necessary that they turn to some other person for legal advice. This they did

and we can see no reason why the obligation incurred thereby should not be treated as an ordinary and necessary expense in carrying on its business under the terms of section 23(a) (1) (A), supra.

Therefore, when it became necessary to impart this legal information to the appropriations committee, it was imperative that they have in attendance their attorney, not only to advise the president and vice president in their testimony before the committee, but to testify and advise said committee on the legal intricacies involved.

The regulation was not designed to protect an illegal act of an appropriations committee but only the legitimate acts of Congress. In this respect, whether plaintiff was right or wrong is of no importance. The important fact is plaintiff believed the appropriation to be illegal and thus was impelled to make its contention known. This is the right of each citizen, company, or corporation, and is in conformity with sound business principles. Viewed in this light, deduction of the attendant expense could not violate the regulation in question.

Their appearance was not to deceive, not to influence, but merely to state their case in an effort to preserve the business the company had built, and in this respect denial of the right of deductibility for expenses attributable to an attempt to enlighten a committee of Congress as to the legality of proposed action would be manifestly unfair. Indeed, Southwestern Power Administration was unquestionably represented by legal counsel and had also its representatives in attendance. Why then should plaintiff not be given the same consideration with right to deduct the attendant expense? We can only answer this question by holding that the expenses enumerated earlier do not fall within the prohibition of the regulation, but are ordinary and

---

7. The advice obtained from plaintiff's general counsel made attendance before the subcommittee more imperative, in that plaintiff was advised that court action would not solve the problem and that appearance before the appropriations committees offered the only solution. The opinion of plaintiff's general counsel has been confirmed by the court's opinion in Kansas City Power & Light Company v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924.

necessary business expenses within the meaning of section 23(a) (1) (A), supra.

Furthermore, there was another and important reason for their appearance before the appropriations committee. Plaintiff was naturally desirous at all times to keep itself informed as to the Southwestern Power Administration's plans, inasmuch as it conceivably could be put out of business as a result thereof, and plaintiff might conceivably remain in business by the purchase of electricity under the terms of the Act of December 22, 1944, supra. Thus plaintiff's appearances were not only geared to the legality of the appropriations but directly connected with its business.

Consequently, we hold that plaintiff is not entitled to deduct as ordinary and necessary business expense the amounts expended for advertising as earlier outlined. Plaintiff is, however, entitled to deduct the travel and legal expenses as referred to heretofore, and judgment is entered to that effect. The exact amount of recovery will be determined pursuant to Rule 38(c) of the Rules of this court.

DURFEE and WHITAKER, Judges, concur.

JONES, Chief Judge (concurring in part in the result).

I have no doubt that the plaintiff or any business concern would be entitled to a deduction for trade or goodwill advertising simply in the interest of securing public understanding. So long as such advertising is not propaganda directly or indirectly influencing legislation, such advertising is an avenue of good public relationship in the normal course of regular business operations.

In modern times every successful business in the United States finds it necessary to advertise regularly in the ordinary conduct of its operations, not only for business purposes but as a basis of fair and honorable operations. Emerson is reputed to have said many years ago that if a man can write a better book, preach a better sermon, or build a better mousetrap than his neighbor, even though he builds his house in the woods, the world will make a beaten path to his door. That was probably at least measurably true in the circumstances that existed at that time. But in the grueling competition of today the man would probably starve to death before the public found out that he was in the woods. In the tremendous competition of today he would be more like the bashful boy who threw his sweetheart a kiss in the dark. He knew what he was doing but nobody else did.

In the current period, if a business concern should try to operate in the dark it would die on the vine, go broke and be forgotten, or, if operating in a restricted field, would probably bring down upon itself the wrath of the public even though due to a misunderstanding. By its silence it would thus sow the seed of its own destruction either by public revolt or by misunderstanding, or by competition that is wise enough to cultivate an understanding public through the medium of judicious advertising. If that man in the woods, however, would do a little intelligent advertising some enterprising concern would probably make newsreels of him and have an interview in which he and his wife would be asked to tell just how it was all done, including some stress stories of long and persistent struggles and heartbreaks on the way to final success.

No doubt the plaintiff, with all other business concerns, knows the value of and probably engages in appropriate goodwill advertising.

The question naturally arises: Is the advertising in question this type or is it intended primarily for the purpose of influencing legislation or action by the Congress, the exploitation of propaganda, or advertising other than trade advertising?

We have read each of the ads that have been submitted in the record and we can reach no other reasonable conclusion than that they were definitely all of the primary propaganda type intended to stir

up such a movement as would directly or indirectly affect action to be taken by the Congress.

Plaintiff makes a distinction between what is known as a legislative bill which is usually in the form of a permanent statute, or an appropriation bill, which has for its purpose simply the carrying out—usually for just one year—all or a part of the enacted legislation. There is a distinction, especially in the House, between the manner in which the two kinds of congressional actions are considered and classified. But this is merely a matter of rules and convenience of procedure. The substance remains the same. Most legislation is inanimate and lifeless without the energizing appropriation. Withholding appropriations in this type of legislation renders such legislation useless, thus destroying its whole purpose. Reducing the essential appropriation partially cripples its effectiveness.

Where, as here, legislation is dependent on affirmative action to become effective, the legislative act is not complete until the appropriation is made. No action of any kind can be taken until funds are available. So any effort to induce the Congress to withhold or substantially reduce the appropriation which is essential to the life and effectiveness of the legislative authorizing act becomes an effort to defeat legislation. However, any such distinction becomes relatively unimportant in the instant case in view of the broad terms of the Treasury Regulation which forbids deductions for expenses incurred in propaganda and "advertising other than trade advertising."

Also bearing on the subject is a provision enacted by the Congress entitled "Title III—Regulation of Lobbying Act," Chapter 753, 60 Stat. 839, 840. Section 302(e) contains the following language:

"The term 'legislation' means bills, resolutions, amendments, nominations, and other matters pending or proposed in either House of Congress, and includes any other matter which may be the subject of action by either House."

Thus, clearly the purpose of this provision was to include under the ban efforts to influence any action taken by the Congress which, of course, would include a legislative measure or an appropriation bill enacted pursuant to legislative authorization.

In the light of the wording of the advertising and especially in view of this declaration of the Congress, I do not think the plaintiff is entitled to a deduction for the type of advertising shown by the record.

The question remains of the allowance of a deduction for attorneys' fees. I think that this matter comes in a different category.

In the complication of laws and reports under which modern business must be operated, there is a vital need for counsel. The Commissioner has found that the work of the counsel, Mr. Arnold, was limited to the legal questions involved and that his advice and appearance were on that basis. He so stated in the oral argument and the statement was not questioned by defendant's counsel.

It appears from the record that the operation and planning of the Southwestern Power Administration in this particular area was done under an executive order issued pursuant to the authorizing act and that the Southwestern Electric Power Company made its plans in accordance therewith. Of course such plans would necessarily be limited to the framework of the act under which the operations were being pursued. Certainly, the business concern was entitled to have counsel advise whether the planners stayed within the limits of the act. Even though it may have stayed within its terms it would be altogether advisable and proper, almost necessary, to have legal advice on whether it had done so.

One of the most highly prized rights of the Anglo-Saxon tradition is to have a day in court and the right to be represented by counsel. I have always thought that one of the chief glories of the Constitution is that the Nation cannot take the shirt from the back of the street

ragamuffin without either securing the lad's consent or paying him for the requisitioned rags. A man is entitled to counsel both in civil and criminal matters. In the light of this record, I think plaintiff is entitled to have a deduction for the legal fees and expenses incurred in connection with the services of Mr. Arnold as described by the trial commissioner. The record rather clearly indicates that the other counsel and officials were engaged largely in connection with proposed legislation or action by the Congress, or at least the record is not clear that this is not true.

Our attention has been called to the provisions of section 3 of the Revenue Act of 1962, which permit deductions for expenses incurred in connection with appearances before, or submission of statements to, congressional committees or individual members of the Congress. But this section, especially when read in connection with the House and Senate Reports, would indicate that the law was otherwise prior to the 1962 enactment. At least the wording does not seem to indicate that the amendment was merely a clarifying declaration of what the intention of the Congress had been in the earlier enactment.

Hence, I concur with the majority that the advertising expenses are nondeductible. I would limit plaintiff's recovery to the fees and traveling expenses of the chief counsel, Mr. Arnold.

DAVIS, Judge (concurring in part and dissenting in part).

I concur in the court's judgment against the deductibility of the advertising expenses, but I dissent from the ruling upholding the deduction of the travel and legal expenses. Under the Treasury Regulation (Treas.Reg. 111, Sec. 29.23(q)–1), the latter amounts were, I believe, non-deductible as "sums of money expended for lobbying purposes" and also for "the promotion or defeat of legislation."

Ever since the prototype of this regulation was issued in 1915 (T.D. 2137), it has forbidden the deduction of "lobbying" expenses. The Supreme Court has said that "lobbying in its commonly accepted sense" means "representations made directly to the Congress, its members, or its committees." United States v. Rumely, 345 U.S. 41, 47, 73 S.Ct. 543, 97 L.Ed. 770 (1953); United States v. Harriss, 347 U.S. 612, 620, 74 S.Ct. 808, 98 L.Ed. 989 (1954). The term has not been limited to improper or clandestine activities. In appearing before committees of the Congress, plaintiff's officers and counsel had "direct communication with members of Congress on pending or proposed federal legislation" (United States v. Harriss, supra), communications which were within "lobbying in its commonly accepted sense." It is true that the Regulation of Lobbying Act, enacted in 1946, excepts from its coverage "any person who merely appears before a committee of the Congress of the United States in support of or in opposition to legislation" (60 Stat. 839, 842, 2 U.S.C. § 267), but this was a special exception for that registration statute which did not affect the usual, broader, meaning of the term "lobbying" as it has been employed in the Treasury Regulations since 1915.[1]

The travel and legal expenses plaintiff seeks to deduct were also spent for "the promotion or defeat of legislation." That phrase in the Regulation has a long reach. It has been applied to attempts to influence Congress to pass statutes (Textile Mills Securities Corp. v. Commissioner, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249 (1941)); to efforts to induce the electorate of a state to defeat or approve an initiative or referendum (Cammarano v. United States, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959));

---

1. Section 3 of the Revenue Act of 1962, 87th Cong., 2d Sess., P.L. 87–834, enacted October 16, 1962, makes new provisions for deduction of the expenses of appearing before Congressional committees, but these amendments apply only to taxable years beginning after December 31, 1962.

to expenditures for appearances before state legislators (Bellingrath v. Commissioner, 46 B.T.A. 89 (1942)); and to programs designed to influence the voters of a city against a proposed ordinance (Sunset Scavenger Co. v. Commissioner, 84 F.2d 453 (C.A.9, 1936)). To me, this sweeping phrase—designed to cover the entire range of law-making by "legislative" bodies of all types—clearly applies to an attempt to persuade an Appropriation Committee of the Congress not to implement a pre-existing statute by including the necessary money in an appropriation bill. This is just as much an effort to defeat Congressional "legislation" as it would be if the appearances were related to a substantive bill. Authority to enact appropriation measures is among the "legislative powers" granted to Congress by Article I, Section 1, of the Constitution; an appropriation bill, once enacted, is a statute and law of the United States like any other, as the Constitution itself expressly recognizes (Art. I, Sec. 9) by declaring that "no Money shall be drawn from the Treasury, but in Consequence of Appropriations made *by Law*" (emphasis added); indeed, Congress can amend substantive legislation through an appropriation bill, if it chooses to disregard its own internal rule against doing so (United States v. Dickerson, 310 U.S. 554–555, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940); Eisenberg v. Corning, 86 U.S. App.D.C. 21, 179 F.2d 275–276 (C.A.D.C. 1949)). Nor does it matter, for this comprehensive Regulation, that the plaintiff's presentation to the Committees was primarily legal or that it acted in all good faith to show Congress that the proposed appropriations would not be validly authorized by the prior substantive statute. As the decisions show, the Regulation is neutral and all-inclusive; it has no concern with weighing the merit or scope of a taxpayer's arguments why certain legislation should be passed or defeated; it precludes deductions of expenditures made with the purest of motives as well as those with the basest; and it applies to those petitioners with

the most compelling of arguments as well as those with the most frivolous. Similarly, it is irrelevant that plaintiff thought that it was fighting for its business life; the Supreme Court, the Courts of Appeals, and the Tax Court have applied the Regulation to comparable cases in which an enterprise considered that the legislation it was opposing or promoting would destroy or save it (Cammarano v. United States, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959), affirming 246 F.2d 751 (C.A.9, 1957) and 251 F.2d 724 (C.A.8, 1958); Sunset Scavenger Co. v. Commissioner, 84 F.2d 453, 456 (C.A.9, 1936); Revere Racing Assn. v. Scanlon, 232 F.2d 816 (C.A.1, 1956); Davis v. Commissioner, 26 T.C. 49, 58–60 (1956)).

These conclusions stem not only from the terms and history of the Regulation but also from its underlying policy—and that of the Congress at the time of plaintiff's expenditures. This policy was against any "public subvention" by the federal fisc of efforts to change or maintain legislation. Neither side to such controversies was to be aided by tax deductions; both were to pay for their legislative activities "entirely out of their own pockets." So far as the revenue was concerned there was to be tax equilibrium, with no weight to be thrown on either scale. Business and trade interests were not to be given a tax advantage over opposing non-business interests (individual and organizational) which ordinarily must bear their expenses of this character without compensating deduction. See Cammarano v. United States, supra, 358 U.S. at 512, 513, 79 S.Ct. at 532, 533, 3 L.Ed.2d 462 (1959); Slee v. Commissioner, 42 F.2d 184–185, 72 A.L.R. 400 (C.A.2, 1930). The basic theory was that everyone should participate in the electoral and legislative process purely as an unsubsidized citizen, not some few with the added help of financial backing by the federal treasury. Plaintiff seeks this semi-subsidized status which the law at that time deliberately chose not to accord it.