The CONNECTICUT LIGHT AND POW-
ER COMPANY and Subsidiaries

v.

The UNITED STATES.

No. 4–62.

United States Court of Claims.

Nov. 10, 1966.

N. Barr Miller, Washington, D. C., for plaintiff. J. Marvin Haynes, Washington, D. C., attorney of record. Haynes & Miller, Joseph H. Sheppard and Arthur H. Adams, Washington, D. C., of counsel.

Robert Livingston, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report of findings of fact filed June 10, 1964, which was amended, supplemented and made a part of a further report and opinion filed on July 9, 1965, after the court had granted plaintiff's motion to "Reopen Record and for Supplemental Report of Trial Commissioner." Plaintiff requested that the court adopt the findings of fact as amended and supplemented by the opinion and report filed

July 9, 1965, and excepted to the trial commissioner's recommended conclusions of law. Defendant excepted to the supplemental findings and the recommended conclusions of law. The case was submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the trial commissioner's findings, opinion and recommended conclusions of law as set forth in the report and opinion as amended and supplemented, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to deduct as ordinary and necessary business expenses the amounts expended to Bleachery and the pertinent attorneys' fees paid for services in the promotion and defeat of legislation, and as to these claims the petition is dismissed. However, plaintiff is entitled, beginning in the year 1955, to include in its composite depreciation account as capital expenditures the payments to Bleachery to the extent of $987,-558.29, and judgment is entered to that effect with the amount of recovery to be determined pursuant to Rule 47(c).

## OPINION OF COMMISSIONER*

HOGENSON, Commissioner:

Plaintiff is and was at all pertinent times a Connecticut public utility corporation, hereinafter called Connecticut Light.[1] During the years involved in the present action, 1954 and 1955, plaintiff was engaged in the production and sale of gas and electricity and the sale of water. In March 1953, plaintiff began constructing a dam and hydroelectric power plant (hereinafter referred to as the Shepaug project) on the Housatonic River in the State of Connecticut.

The purpose of the dam was to impound the river water to an elevation of 200 feet above sea level, create a lake covering 1,870 acres, and to back water up to plaintiff's Rocky River hydroelectric development which was situated 14 miles up the Housatonic River from plaintiff's Shepaug dam site.

Approximately 10 miles above the site of the new dam, the Robertson Bleachery & Dye Works, Inc., (hereinafter called Bleachery) owned about 23 acres of land, above water, fronting on the Housatonic River, and 7 acres of land below water. Bleachery also owned an island in, and maintained a spillway and main dam across the Housatonic River. Its business operations consisted of bleaching, dyeing, mercerizing, shrinking, and finishing fabrics shipped to it by its customers; its plant consisted of five sizable buildings and several other smaller ones which were used for these operations.

Upon completion and operation of the dam, the pond, when elevated to 200 feet, would extend upstream beyond the Bleachery property. In addition to the 7 acres of Bleachery property already under water, an additional 9.135 acres, owned by Bleachery, were located below the maximum ponding elevation of 200 feet above sea level. The balance of land, approximately 13.20 acres, which included the land upon which the buildings were located, had an elevation between 200 and 210 feet above sea level.

In order to complete the Shepaug project it was necessary that plaintiff obtain flowage rights and immunity from future tort liability for any damages which would result to the Bleachery property. Plaintiff attempted to purchase

---

\* The opinion, findings of fact and recommendation for conclusion of law are submitted under the order of reference and Rule 57(a).

1. Electric Power, Inc., was a wholly-owned subsidiary of plaintiff. It was organized to construct and operate the pertinent dam and power plant in order to eliminate the possibility that plaintiff might become subject to dual regulation by the Public

Utilities Commission of Connecticut and the Federal Power Commission. However, the Federal Power Commission subsequently issued a ruling eliminating the above possibility and thereafter, in December 1954, plaintiff acquired the assets of Electric Power and completed the construction of the dam. It will be assumed, in this opinion, that Connecticut Light is the sole corporation involved in this action.

such rights and immunity, but such negotiations were unsuccessful. Exercising its power of eminent domain, plaintiff instituted a civil action against Bleachery in the Superior Court of Litchfield County, Connecticut. Connecticut Light alleged that for the construction of the dam across the Housatonic River and creation of the pond, it was "necessary and convenient" for it to take and use the following interests and rights in the premises of Bleachery:

The easement, privilege and right to raise the waters of the Housatonic River in front of the aforesaid premises of The Robertson Bleachery & Dye Works, Incorporated, and to maintain them at a height not to exceed elevation 200 * * *, and to flood, and to set back and deposit water in, on and upon so much of the aforesaid premises as lies at or below the aforesaid elevation 200, and the right to store, use and dispose of, or draw off and lower the level of any water in front of or so set back upon said premises.

On July 29, 1954, the Connecticut court on petition of Connecticut Light and the answer of Bleachery, entered judgment and ordered a three-man committee (hereinafter called the committee) to assess the amount of damages which would arise to Bleachery out of the taking and using of the "aforesaid easements, privileges and rights." On December 1, 1954, the committee filed its report, and on January 7, 1955, the Connecticut court entered judgment accepting the report and directed Connecticut Light to pay the Bleachery $960,000. The following are excerpts of the pertinent parts of the committee report:

The rights and easements acquired by the petitioner include the right to set back and flood so much of the respondent's premises as lie at or below the aforesaid elevation 200 and the right to store, use and dispose of, or draw off and lower the level of any water in front of, or so set back upon, the respondent's premises.

Ponding by the petitioner's dam to the 200 foot elevation will raise the water about one foot above the level of the respondent's dam and will flood the basement of the respondent's plant between two and three feet and render the factory inoperable without extensive protective measures. It will prevent the use for water power of the respondent's dam, and flood land adjacent to the buildings.

*    *    *    *    *    *

The petitioner offered evidence of protective measures which it claims would prevent any flooding of the respondent's plant that might result from raising the water level to elevation 200. The plan is to encircle the works with steel sheet piling driven on an average of forty feet to rock with the top of the sheet piling at an elevation of 201. The claim is that this plan, if carried out, would enable the respondent to operate substantially the same as at present, would not interfere with the operation of the respondent's plant during construction and would not increase flood hazards. It would take about six months to install such measures.

The cost of such protective construction and its amortized maintenance cost were estimated by the petitioner's experts to be $650,884. This was based in part on a bid of $490,884.00 for construction, if accepted within two months. The petitioner offered evidence of additional damage of $9,000 for other land flooded. The petitioner claims that the cost of the protective plan is the measure of the respondent's damages with the additional $9,000.

The respondent offered evidence that the cost of such protective measures would be greatly in excess of the petitioner's estimate, would not provide for a proper discharge of waste and would not be a justifiable expense from an economical standpoint. It further offered evidence that the taking would prevent it from making repairs on its own dam which it would

have to maintain to impound water when the petitioner's pond was drawn down, and that the petitioner's dam would cause greater flooding of its property in flood periods. It offered evidence as to the cost of removal of its heavy machinery.

The respondent claims that the true measure of its damage is the difference in the fair market value of its property before and after the taking including the cost of removal of its heavy machinery.

\* \* \* \* \* \*

Our conclusions from the evidence and a thorough examination of the premises are as follows:

We find that the prospective use of the property for hydro-electric power is of no value.

We find that the petitioner's estimated cost of protective measures would not fully compensate the respondent for its loss.

We find that the estimated cost of removal of the heavy machinery would not affect the market value of the property to the extent claimed, although this item has been given consideration in establishing the value of the property before taking.

We find the fair market value of the respondent's property before the taking to be $1,125,000 and its fair market value after the taking to be $165,000.

We assess the respondent's damages at $960,000.

■ Plaintiff deposited its check for $960,000 with the clerk of the Connecticut court on December 23, 1954, and such check was delivered to Bleachery on January 7, 1955. In 1954, plaintiff paid the costs of the condemnation proceedings in the amount of $8,626.77. On April 29, 1955, the Connecticut court in supplemental proceedings ordered plaintiff to pay, and plaintiff then paid $30,000 for appraisal and attorneys' fees in connection with the condemnation proceedings and $360.38 for costs of such supplemental proceedings.[2] Plaintiff on its Federal income tax return deducted $957,626.77 in 1954,[3] and $30,360.38 in 1955.[4]

These amounts were deducted in the belief that, with the exception of the flowage rights acquired on the 9.135 acres of land below the 200-foot contour, such damages and costs were deductible either as a loss or business expense.

The examining agent of the Internal Revenue Service gave the following reason for disallowing these deductions:

The above payment deductions are held to represent the cost of acquisition of certain land rights and privileges, directly related with the construction of the Shepaug hydroelectric plant, and to constitute nondeductible capital expenditures under Federal Income Tax Regulations Section 1.263 (a)–1.

Plaintiff maintains its books of account and files Federal income tax returns on the accrual method of accounting and on the calendar year basis.

■ For depreciation purposes, plaintiff uses the "composite" account method, wherein all the assets of the business are included in a single account, as provided in Treas. Reg. § 1.167(a)–7(a) (1956). Under this method, all of the property items utilized by the plaintiff in its operations are grouped into one account

---

2. Both parties agree that the deductibility of the appraisal and legal fees and related costs depend upon the nature of the underlying payments to which they relate.

3. Out of the $968,626.77 paid to the Bleachery in 1954, plaintiff estimated that $11,000 was payment for flowage rights on the 9.135 acres.

4. Although the Public Utilities Commission of the State of Connecticut has provided how such expenditures shall be treated, neither the Commissioner of Internal Revenue nor the court is bound by the Utility Commission's regulation. (See finding 18.) Old Colony R.R. Co. v. Commissioner of Internal Revenue, 284 U.S. 552, 562, 52 S.Ct. 211, 76 L.Ed. 484 (1932).

and one composite rate of depreciation is applied to the group. The rate is based on the average useful life of all the property included in the group and is applied to the average of the beginning and ending balances of the asset account for the taxable year.

Since 1940, in accordance with a proposal made by agents of the Internal Revenue Service and accepted by plaintiff, plaintiff has applied a straight-line depreciation rate of 3.15 percent, consistently using such rate on all depreciable properties acquired prior to January 1, 1954. With respect to property acquired subsequent to December 31, 1953, the plaintiff, in accordance with section 167 of the Internal Revenue Code of 1954 has used the so-called double declining balance method, under which the composite straight-line rate of 3.15 percent was increased by plaintiff to 6.30 percent. This has the effect of permitting plaintiff to recoup a larger percentage of costs incurred during the earlier years of the lives of the properties, and a lesser percentage during the later years. Upon the examination and audit of plaintiff's 1954 and 1955 returns, an engineer agent of the Internal Revenue Service reviewed and recommended approval of the depreciation rates claimed by plaintiff for those years. This recommendation was adopted by the Internal Revenue Service, and no deficiency assessment was proposed on account of the use of such rates.

Plaintiff did not include in its assets depreciable for Federal income tax purposes the land and water rights acquired for the Shepaug project, nor the above-described payments to the Bleachery. All of the plaintiff's other costs in constructing the Shepaug hydroelectric plant and dam were included in plaintiff's composite account of depreciable assets, to which was applied the composite rate of 3.15 percent, or 6.30 percent, according to dates of expenditures.

When the composite rate of 3.15 percent was proposed by agents of the Internal Revenue Service and accepted by plaintiff in 1940, plaintiff's depreciable properties were separated into categories, such as steam plants, hydroelectric facilities, transmission and distribution systems, and a number of others. Each category of properties was taken into the composite rate on the basis of a different life assigned for depreciation purposes. Hydroelectric properties were considered to have a life of 50 to 60 years, whereas the life used for a steam plant was about 30 years.

Within the time prescribed by law, plaintiff duly filed its consolidated Federal income tax returns for the years 1954 and 1955, and paid the taxes shown thereon in installments on or about the statutory due dates in the respective amounts of $6,977,456.99 and $6,323,881.-29.

On or about March 10, 1961, the plaintiff entered into an agreement with the appropriate District Director of Internal Revenue extending the period of limitations upon the assessment of income taxes for the years 1954 and 1955 to and including June 30, 1962.

After the Internal Revenue Service made its examination and audit of plaintiff's 1954 and 1955 returns and disallowed as deductions items herein described, and other items not now contested, the Commissioner of Internal Revenue assessed deficiencies in income taxes against the plaintiff for those years in the following amounts, together with interest in the amounts shown, and the aggregate amount for each year was duly paid by the plaintiff on or about May 15, 1961:

| Year | Assessed Tax | Interest |
|------|-------------|----------|
| 1954 | $472,273.00 | $173,932.32 |
| 1955 | 40,609.00 | 12,519.25 |

On or about July 27, 1961, the plaintiff filed with the appropriate District Director of Internal Revenue claims for refund for the years 1954 and 1955 in the respective amounts of $785,235.14 and $142,861.52, plus interest on such amounts, asserting therein the same grounds as those herein relied upon for relief. Such claims for refund were disallowed by the Commissioner of Internal Revenue under date of November 2, 1961.

If it is decided that plaintiff has correctly deducted $957,626.77 in 1954 and $30,360.38 in 1955 as ordinary and necessary business expense, under section 162 of the Internal Revenue Code of 1954,[5] then, of course, there would be no other issue as to such expenditures. However, if the above amounts are capital expenditures under section 263, it is necessary to decide whether such expenditures are depreciable assets within the meaning of section 167 and, if so, the correct rate and method of depreciation permitted under the same section. These questions will be discussed in proper sequence.

Whether the above amounts are deductible in 1954 or 1955, or, as defendant contends, are in the nature of capital expenditures is determined under the following sections of the Internal Revenue Code:

§ 162. Trade or business expenses.

(a) In general. There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\* \* \* \* \* \*

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not tak-en or is not taking title or in which he has no equity.

\* \* \* \* \* \*

§ 261. General rule for disallowance of deductions.

In computing taxable income no deduction shall in any case be allowed in respect of the items specified in this part. [§§ 261–273]

§ 263. Capital expenditures.

(a) General rule. No deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate.
\* \* \*

Since section 261 bars a deduction of any item specified in section 263,[6] the threshold question is whether these amounts have been paid out within the meaning of section 263(a) (1). The relevant portions of the Treasury Regulations promulgated under section 263 are as follows:

§ 1.263(a)–1. Capital expenditures; in general.

(a) Except as otherwise provided in chapter 1 of the Code, no deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate, or

\* \* \* \* \* \*

(b) In general, the amounts referred to in paragraph (a) of this section include amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use. Amounts paid or incurred for incidental repairs and maintenance of property are not capital expenditures within the meaning of subparagraphs (1) and (2) of

---

5. All references to "section" or "sections," unless otherwise indicated, refer to the Internal Revenue Code of 1954.

6. Also see section 161 which states in effect that items included within the scope of section 263 are not deductible under section 162.

this paragraph. See section 162 and § 1.162–4.

Plaintiff's contention, briefly stated, is that the only property right acquired was the right to flood the 9.135 acres of Bleachery property and therefore, the only part of the expenditures correctly capitalized is the amount paid for the right to flood such land ($11,000) and the attorney and court fees related to such flowage rights.[7] Plaintiff further contends that the remaining amount, being an ordinary and necessary business expense, is deductible under section 162.

Defendant claims that the expenditures are within the scope of section 263(a)(1) since they have permanently improved taxpayer's land, and the flowage and seepage rights acquired will continue to have value to the plaintiff in the course of its business. Defendant further contends that since no damages had occurred at the time the Connecticut court rendered judgment, it must be concluded that the damages awarded were the value of property rights taken and used by the condemnor and therefore within the scope of section 263.

The line which separates capital expenditures from ordinary expenses cannot always be clearly drawn. The problem in close cases, involving unique factual patterns, was noted in Russell Box Co. v. Commissioner of Internal Revenue, 208 F.2d 452, 454 (1st Cir.1953), as follows:

> It has been said that the essential difference between an ordinary and necessary business expense and a capital expenditure is the difference between upkeep and investment, or between a maintenance or operating expense and a capital disbursement. * * * But such statements do not go far in solving concrete cases. When all is said, the fact remains that close cases have to be decided by the Tax Court one by one as individual instances, and that our function is to reverse the Tax Court only when we are convinced that its conclusion in a particular case is clearly erroneous. * * * [Citations omitted]

The Connecticut court committee found that if the dam had been built and put into operation prior to the Bleachery's taking any protective measures, the factory would have been made inoperable and the basements of, and the land adjacent to the Bleachery's buildings would have been flooded. Plaintiff, in its brief, cites a number of cases in which taxpayer was permitted a deduction for an expenditure resulting from a tortious act of the taxpayer in carrying on a trade or business.

In Anderson v. Commissioner of Internal Revenue, 81 F.2d 457, 104 A.L.R. 676 (10th Cir.1936) and Plante v. United States, 226 F.Supp. 314 (D.N.H.1963), each taxpayer was permitted a deduction for payments made for damages to another's property caused by operation of taxpayer's vehicle; in A & A Tool & Supply Co., 8 T.C.M. 473 (1949), taxpayer was permitted a deduction for costs arising from taxpayer's wrongful repossession of equipment; in Fred W. Staudt, 12 T.C.M. 1417 (1953), aff'd 216 F.2d 610 (4th Cir.1954), taxpayer was permitted a deduction for payments to a person injured on taxpayer's premises.

Assuming that part of plaintiff's payments to Bleachery was for prospective damage to Bleachery's property, the above cases are nevertheless not applicable. Although such payments might be deemed to be compensation to Bleachery for damages which would result from tortious conduct, the circumstances causing the payments are different from those in the above-cited cases. As stated in Hales-Mullaly, Inc. v. Commissioner of Internal Revenue, 131 F.2d 509, 511–512 (10th Cir.1942), "The decisive test

7. Plaintiff concedes, in its Reply Brief, filed May 11, 1965, that the legal and appraisal fees relating to the cost of the 9.135 acres ($11,000) should be capitalized. $11,000 represents 1.1 percent of the total payment of $960,000. Consequently, 1.1 percent of the costs of $38,987.15 or $428.86 should be capitalized. Thus, the total Bleachery payments in issue are $987,558.29.

still is the character of the transaction which gives rise to the payment."

In each of the above cases, the expenditure resulted from activity in the ordinary course of the taxpayer's business, and there was no connection with earning of future revenue. It was unrelated to construction or improvement of any property or asset owned by the taxpayer, and subsequent to the payment, no asset of the taxpayer increased in value or was made adaptable to a different use.

In order for plaintiff to complete and operate the Shepaug project, it was necessary to construct the dam and make payment for damages which would be inflicted on the property of others, or provide protective measures so that no damages would occur. Such payments would permit plaintiff to operate the Shepaug project with immunity from liability for continuing tortious conduct. It is clearly expected that the hydroelectric plant will continue to operate for many years in the future and be a continuing source of revenue and income for the plaintiff. The payments to the Bleachery are as much a part of the cost of the project as labor and material used in the construction of the Shepaug project. Such payments contribute to the value of the property as much as other costs which are seemingly more closely connected. The general rule as stated in United States v. Akin, 248 F.2d 742, 744 (10th Cir.1957), is applicable:

It is not always easy to find a verbal formula which readily supplies an unerring guide in drawing the boundary line between current expenses and capital outlays. But it may be said in general terms that an expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year or *if it secures a like advantage to the taxpayer which has a life of more than one year.* [Emphasis supplied]

Moreover, even if the expenditure does not result in the acquisition of a specific asset, it is not precluded from being capital in nature. Section 263 includes amounts paid out for "permanent improvements or betterments made to increase the value of any property."

In Gauley Mountain Coal Co. v. Commissioner of Internal Revenue, 23 F.2d 574, 578 (4th Cir.1928), the taxpayer acquired the use of a siding by supplying coal to a railroad at less than market price, with the railroad at all times retaining title to the siding. In holding that the cost to the taxpayer was a capital expense, the court stated:

It is said that, because the track of the branch line is the property of the railroad, and no time is specified by the contract during which the railroad shall continue furnishing service over same, the taxpayer has received no property, tangible or intangible, for the expenditure it has made. But the important thing to the taxpayer is, not the ownership of the track, but the fact that by means of it is furnished the railroad connection desired. In the case of industrial sidings, just adverted to, the track is generally the property of the railroad.

This holding on similar facts was followed in Colony Coal & Coke Corp. v. Commissioner of Internal Revenue, 52 F.2d 923 (4th Cir.1931).

Plaintiff's contention that Connecticut Light & Power Co. v. United States, 299 F.2d 259, 156 Ct.Cl. 304 (1962), is applicable to the present case is not sustained. In that case, taxpayer successfully contended that the cost incurred resulting from repairs made to its customers' appliances were ordinary and necessary business expenses under § 23 (a) (1) (A) of the Internal Revenue Code of 1939. Taxpayer had made such repairs so that natural rather than artificial gas could be used. The court stated:

* * * It appears to us, rather that their net effect was to enable plaintiff to retain precisely the same privilege of supplying gas to its customers, for as long as they desired, as it had previously.

After all, it was still the choice of the customer as to whether he would continue to use or discontinue using plaintiff's gas. The facilities involved here were and remained the property of the customer. The repairs were an essential *service operation.*

Similarly, we do not feel that the expenditures increased the value, adapted to a different use, or prolonged the useful life of the appliances to such an extent as to fall within the concept of capital expenditure. No such increase in value is discernible from the record apart from that which would naturally obtain from any ordinary · epairs to property. Nor is there any indication that the expenditures prolonged the useful life of the appliances by as much as a single day. The general thrust of the conversion program would seem to be that the *relatively minor adjustments* made to these appliances, at a relatively insubstantial cost, merely permitted them to function in the same manner and for the same purposes as before. * * *

We incline to the view that these expenditures more closely resemble ordinary repair costs which, in the words of section 39.23(a)–4 of Treasury Regulations 118, kept the appliances in their "ordinarily efficient operating condition."

*    *    *    *    *    *

In view of the foregoing, it is our opinion, and we so hold, that, on balance, the expenditures in question more closely resemble *ordinary repair* expenses or expenses made to retain or protect an existing business than they do capital outlays. [Emphasis supplied]

Plaintiff's payments to Bleachery had no resemblance to a "service operation," "ordinary repair," or "minor adjustments."

■ Consequently, even if it is assumed that the only rights plaintiff received were the flowage rights on the 9.135 acres and the costs of these rights were $11,000, the remaining amount can still be considered a capital expenditure if it was spent in acquiring something of permanent use and value in taxpayer's business. Such payments enabled taxpayer to build and operate its Shepaug project with immunity from any future tort liability. Such immunity is of continuing value to the taxpayer. The payments of $968,626.77 in 1954 and $30,-360.38 in 1955 are capital expenditures.

## DEPRECIATION ISSUE

Mertens Law of Federal Income Taxation, § 23.01 (1960 ed.) p. 7, states:

Like many other simply stated statutory provisions, the provision for the deduction of depreciation gives rise to more problems than a casual reading of the statute would suggest. What property is depreciable? Who is to be allowed depreciation? What is the capital sum to be recovered through depreciation? Under what method is the deduction to be computed? The answers to such generic inquiries depend frequently upon troublesome questions of fact relating to specific property.

Section 167(a) describes the circumstances under which a depreciation deduction is allowable:

§ 167. Depreciation. (a) General Rule. There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income.

Defendant's position, in claiming that plaintiff is not entitled to a depreciation deduction, is that there are two requirements for depreciation: (1) the asset must have a useful life extending over a limited number of years and (2) the salvage value at the end must be less than the original cost. Defendant maintains that the legal interest obtained by the plaintiff was of unlimited duration, and that no wear, tear, or exhaustion would occur to the property obtained by Con-

necticut Light. Defendant contends, moreover, that plaintiff could not show that there was a limited life to these interests obtained since there were many prospective uses that the taxpayer could put them to, such as—(1) future projects of the taxpayer on the Housatonic River, (2) future plans to generate power by hydroelectric means, (3) potential sale and storage of water in lakes and reservoirs created by the hydroelectric project, and (4) immunity from payment for seepage damage to buildings on the Bleachery's property.

Plaintiff's contention, briefly stated, is that all the cost incurred, except the flowage rights over the 9.135 acres ($11,000), are depreciable over the life of the Shepaug project. In support of its position, plaintiff relies heavily on Union Electric Co. of Missouri v. Commissioner of Internal Revenue, 177 F.2d 269 (8th Cir.1949).

*Union Electric Co.,* supra, is accepted as persuasive in principle; the facts are similar to the plaintiff's case. In that case the taxpayer had built a dam and hydroelectric plant for the generation and transmission of electricity. In constructing the project, the taxpayer incurred [p. 271] "the costs of replacing inundated highways, bridges and roads; damages to buildings, improvements and other property razed or destroyed in the construction of the reservoir; the expenses of moving bodies from cemeteries; the cost of rights and easements to flood property; the cost of condemnation for flowage rights which revert to the original owners upon non-use for the purpose for which condemned." The court, in holding that the above costs should be capitalized and depreciated, stated [p. 275]:

The taxpayer is not claiming the right to recover costs of land title to which was taken in fee simple. Such costs it is conceded are not so recoverable. The cost of land and flowage rights involved refers to *expenditures for highways, bridges and damages to property inundated, condemnation for flowage rights over inundated land*

*which revert to the original owner on non-use; costs of buildings and improvements to town property which were razed or destroyed; moving bodies from cemeteries, and the like.* Easements for transmission lines include lines leading from the plant to the city of St. Louis. These lands and flowage rights and easements have no value except as they are used in connection with the power plant. It follows logically, it seems to us, that their useful life must diminish and end with the useful life of the plant itself. [Emphasis supplied]

Defendant attempts to distinguish *Union Electric Co.,* supra, on three grounds—(1) silt deposits would make the Union Electric dam unusable at the end of its 100-year life; (2) flowage rights obtained by Union Electric had no value except in connection with the power plant; (3) the flowage rights obtained reverted to the original owners on non-use. However, all rights and immunity that plaintiff acquired, as a result of the payments to Bleachery, had no value except in connection with the Shepaug project. The rights are so closely connected with the dam that they will only be useful as long as the project is in operation. It is undisputed that the project has a limited lifetime.

In response to the defendant's contention that the expenditures are not depreciable because the rights acquired *might* be used in connection with another hydroelectric project which *might* be constructed after the Shepaug project becomes useless, it is appropriate to use the answer stated by the court in *Union Electric Co.,* supra, to this same contention of the defendant. The court stated [p. 275]:

But the Commissioner argues that in the event another dam should be constructed at the same place in the Osage River after the present dam has become useless these rights here involved would not be exhausted and they would never require replacement. In such case the taxpayer would not have to pay anew for highways submerged, for

buildings razed nor for moving bodies from cemeteries. In this the Commissioner does not take into the account the principle that the right to deductions for depreciation does not depend upon mere possibilities. [Citations omitted]

■ The payments to Bleachery by plaintiff, with the exception of the cost of flowage rights on the 9.135 acres ($11,000 plus $428.86, the allocable share of appraisal and legal fees, or $11,428.-86), are depreciable within the meaning of section 167.

As previously stated in detail, plaintiff employed a composite depreciation account including all assets regardless of their character or useful lives, all as authorized by pertinent regulations. Treas. Reg. § 1.167(a)–7(a) (1956) states:

* * * A broader grouping, where assets are included in the same account regardless of their character or useful lives, is commonly referred to as a composite account. For example, all the assets used in a business may be included in a single account. * * *

Defendant contends that the payments made to Bleachery, in the event that they be considered depreciable capital expenditures, cannot be combined in the "composite account" for depreciation purposes. It relies upon three grounds—(1) the taxpayer's particular composite rate was recommended for approval by an agent of the Internal Revenue Service upon the assumption that the depreciable base did not include the payments to Bleachery, (2) the taxpayer has not established that the rights, easements, and privileges will necessarily be less than the original costs, and (3) since the Shepaug project was only in operation for 2 months in 1955, it should only be depreciated for 2 months in 1955, and plaintiff by including it in its composite account, would depreciate the assets for the entire year. The first objection is unsupportable when the relative amount of the payment is compared to the entire depreciable base; the second is contrary to the established facts in this case; and

the third is incorrect since the plaintiff uses an "averaging convention" described in Treas.Reg. § 1.167(a)–10(b) (1956).

■■ In 1955 the total depreciable base subject to the double declining balance method of depreciation was $26,-408,699; the total depreciable base was $192,546,460. The amount in question, in the present action, was $987,558.29 which is slightly less than 4 percent of the base subject to the double declining balance method of depreciation. It is possible that the agent may have taken such payment into consideration when agreeing upon a depreciation rate, but in any event, its effect would have been inconsequential. While the nature of the composite depreciation account is that it may include assets with widely varying useful lives, to which one rate of depreciation is applied, it does not appear that plaintiff's account would become unbalanced by including the expenditures to Bleachery. Whatever was acquire⁻ by the plaintiff by the payments to Bleachery should be depreciated at the same rate as the other depreciable costs of the project. The payments to Bleachery are inseparably linked with the overall costs of the project and should be considered as part of such depreciable costs.

■ Finally, the fact that only 2 months' depreciation was available in 1955 on the Bleachery expenditures is not relevant in view of plaintiff's use of the "averaging convention" as authorized by pertinent regulations. Treas.Reg. § 1.-167(a)–10(b) (1956) states:

The period for depreciation of an asset shall begin when the asset is placed in service and shall end when the asset is retired from service. A proportionate part of one year's depreciation is allowable for that part of the first and last year during which the asset was in service. However, in the case of a multiple asset account, the amount of depreciation may be determined by using what is commonly described as an "averaging convention" that is by using an assumed timing of additions and retirements. For ex-

ample, it might be assumed that all additions and retirements to the asset account occur uniformly throughout the taxable year, in which case depreciation is computed on the average of the beginning and ending balances of the asset account for the taxable year. * * * In any year in which an averaging convention substantially distorts the depreciation allowance for the taxable year, it may not be used.[8]

It is concluded that beginning in 1955, the payments to Bleachery are to the extent of $987,558.29 includable in plaintiff's composite account for depreciation purposes.

### LOBBYING EXPENSE

During 1955, plaintiff paid the Hartford, Connecticut law firm of Day, Berry & Howard (hereinafter referred to as Day) in excess of $28,000 for overall legal services performed. The Commissioner of Internal Revenue disallowed as a deduction on plaintiff's 1955 income tax return, $6,774.57 of such fees.

The explanation for disallowing such amount was contained in the following report of the examining agent of the Internal Revenue Service:

Charges for services rendered in connection with the drafting of legislation and advice on the construction and effect of proposed and pending legislation (Item (d) above), [$4,014.57] and as legislative agent of the taxpayer, (Item (e) above), [$2,760] before the 1955 session of the Connecticut General Assembly are non-deductible expenditures incurred for promotion or defeat of legislation under Federal Income Tax Regulations Section 1.162–15(c).

Two statements sent on July 5, 1955, by Day, to the plaintiff, described the services rendered. Out of the total amount of $6,774.57 disallowed, $4,014.57 was charged for "Professional Services rendered in connection with drafting leg-

islation, advice as to construction and effect of proposed and pending legislation before January, 1955 Session of Connecticut General Assembly * * *" and $2,760 was charged for "Professional Services as legislative agent before January 1955 Session of the Connecticut General Assembly and Committees thereof and preparation of information and memoranda for Committees * * *."

As required by Connecticut law, plaintiff formally registered two members of such law firm with the Connecticut Secretary of State as legislative lobbyists, and stated that the compensation paid or promised to them was the total amount of $2,760. Examples of memoranda submitted by this firm to committees of the Connecticut legislature are in evidence in this case, and they show that such attorneys opposed, favored, or suggested amendments to various bills concerning the regulation or operation of public utilities.

It is plaintiff's contention that the amounts disallowed were deductible as ordinary and necessary business expenses for the following reasons: $2,760 was paid for presenting plaintiff's views with respect to pending legislation before the appropriate committees of the Connecticut Legislature; $4,014.57 was incurred for advice given to plaintiff concerning the construction and effect of proposed and pending legislation affecting its business and for the drafting of possible legislation. Plaintiff denies that such expenses had any connection with the promotion or defeat of legislation and consequently do not fall within the scope of Treas.Reg. § 1.162–15(c) (1) and (3) (1959).

Defendant, on the other hand, contends that the following activity for which the Day firm was compensated, constituted promoting or opposing legislation, and is therefore, within the scope of Treas. Reg. § 1.162–15(c) (1) and (3) (1959). Plaintiff's attorneys, it is contended,

8. The defendant does not contend that the averaging convention substantially distorts the depreciation allowance nor is there an allegation that it should not be used for the taxable year.

were: (1) registered as legislative lobbyists employed by the taxpayer, (2) took positions on various bills introduced in the legislature which might have some effect upon the taxpayer, (3) expressed themselves to legislative committees as either being opposed to, or in favor of the passage of a particular bill, (4) drafted proposed amendments to the bills under consideration, and (5) rendered advice to plaintiff concerning pending legislation.

Treas.Reg. § 1.162–15(c) (1) and (3) (1959)[9], state:

(c) (1)  Expenditures for *lobbying purposes,* for the *promotion or defeat of legislation,* for political campaign purposes (including the support of or opposition to any candidate for public office), or for carrying on propaganda (including advertising) related to any of the foregoing purposes are not deductible from gross income. * * *

\* \* \* \* \* \*

(3)  Expenditures for the *promotion or the defeat of legislation* include, but shall not be limited to, expenditures for the purpose of attempting to—

(i)  Influence members of a legislative body directly or indirectly, by urging or encouraging the public to contact such members for the purpose of proposing, supporting, or opposing legislation, or * * * [Emphasis supplied]

The Supreme Court, in Cammarano v. United States, 358 U.S. 498, 510, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959), has closed the door to any attack on the validity of the above regulation.[10] The only issue to be decided is whether Day's activities are "expenditures for lobbying purposes," or "for the promotion or defeat of legislation."

If any *part* of either of the disallowed expenses of $4,014.57 and $2,760 is for activity included within the scope of Treas.Reg. § 1.162–15(c), a deduction for the entire amount of each expense would be disallowed, since the burden of proof is on the taxpayer to show the amount due from the United States, Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623 (1935) and Lewis v. Reynolds, 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293 (1931), and the taxpayer has not shown any allocation other than the two categories hereinbefore stated.

Both amounts paid by plaintiff were connected with the legislative process of the Connecticut Legislature—$4,014.57 was paid in part for "drafting legislation, advice as to construction and effect of proposed and pending legislation, * * * "—and, $2,760 was paid for services as a "legislative agent * * * and preparation of information and memoranda for Committees, * * * ." Having its attorneys draft legislative bills was part of plaintiff's efforts to promote legislation.

Plaintiff relies upon Southwestern Electric Power Company v. United States, 312 F.2d 437, 160 Ct.Cl. 262 (1963). In that case, taxpayer incurred legal and travel expenses in connection with appearances before the appropriations committees of the United States Senate and House of Representatives. Taxpayer sought to persuade such committees to withhold funds from the Southwest Power Commission in connection with legislation that had been previously passed. If such funds were appropriated the Commission would be a competitive threat to taxpayer; and taxpayer believed such appropriations, if

---

9. Superseded on April 19, 1965, by Treas. Reg. § 1.162–20(b), which, however, contains identical language. T.D. 6819, 1965 I.R.B. No. 21, p. 9.

10. In Cammarano v. United States, supra, the court upheld the validity of Treas. Reg. 111, § 29.23(q)–1, (predecessor of Treas.Reg. § 1.162–15.) The court noted that since 1918, regulations under the Internal Revenue Acts and Codes, have prohibited a deduction for expenditures related to the "promotion or defeat of legislation." For the history of such regulations see Cammarano v. United States, supra, 358 U.S. at page 503, footnote 6, 79 S.Ct. 524.

made, would be illegal. The court stated at 312 F.2d 444–445, 160 Ct.Cl. 262, 265:

> Their appearance was not to deceive, not to influence, but merely to state their case in an effort to preserve the business the company had built, and in this respect denial of the right of deductibility for expenses attributable to an attempt to enlighten a committee of Congress as to the legality of proposed action would be manifestly unfair. Indeed, Southwestern Power Administration was unquestionably represented by legal counsel and had also its representatives in attendance. Why then should plaintiff not be given the same consideration with right to deduct the attendant expense? We can only answer this question by holding that the expenses enumerated earlier do not fall within the prohibition of the regulation, [Treasury Regulations 111, § 29.23(q)–1, predecessor of § 1.162–15] but are ordinary and necessary business expenses within the meaning of section 23(a) (1) (A), supra.

Plaintiff's activities are not similar. Connecticut Light incurred expenses in connection with "drafting legislation" for plaintiff and "preparation of information and memorandum" submitted to the Connecticut legislature in connection with pending legislation. Such activity falls squarely within the scope of the "promotion or defeat of legislation." Accordingly, plaintiff's expenses were correctly disallowed by the Commissioner of Internal Revenue.[11] Textile Mills Securities Corp. v. Commissioner of Internal Revenue, 314 U.S. 326, 336, 62 S.Ct. 272, 86 L.Ed. 249 (1941); Cammarano v. United States, supra; Mary E. Bellingrath, 46 B.T.A. 89 (1942); Sunset Scavenger Co. v. Commissioner of Internal Revenue, 84 F.2d 453 (9th Cir. 1936).

In summary, it is concluded that plaintiff is not entitled to deduct the payments to Bleachery as ordinary and necessary business expenses; that beginning in the year 1955, plaintiff is entitled to include in its composite depreciation account as capital expenditures the payments to Bleachery to the extent of $987,558.29; that plaintiff is not entitled to deduct the payments of attorneys' fees in issue in this case; and that judgment should be entered to that effect, with reservation of the issues of amount of recovery for determination in further proceedings pursuant to Rule 47(c).

---

11. Section 3 of the Revenue Act of 1962, 87th Cong.2d Sess., P.L. 87–834, enacted October 16, 1962, 76 Stat. 973, makes new provisions for deduction of expenses for activities connected with "legislation or proposed legislation of direct interest to the taxpayer." However, these amendments apply only to taxable years beginning after December 31, 1962.