**TENNECO, INC.**

*v.*

**UNITED STATES of America.**

**Civ. A. No. 65–H–206.**

United States District Court
S. D. Texas,
Houston Division.

Feb. 27, 1969.

Robert K. Jewett and William C. Griffith, Baker, Botts, Shepherd & Coates, Houston, Tex., for plaintiff.

Arthur L. Biggins, Asst. U. S. Atty., Justice Dept., Tax Div., Washington, D. C., for defendant.

*Memorandum and Order*

SINGLETON, District Judge.

This is a civil action brought by Tenneco, Inc. (Tenneco) against the United States of America (Government) for recovery of federal income taxes alleged to have been overpaid for the years 1959 and 1960. Jurisdiction has been stipulated and agreed to by the parties.

Tenneco brought this suit on behalf of itself and Midwestern Gas Transmission Company, a wholly owned subsidiary of Tenneco and an affiliated corporation

within the meaning of the Internal Revenue Code. Tenneco and the Government have agreed that the legal position of Tenneco and Midwestern are identical and for convenience the facts applicable to Tenneco only will be set forth with the understanding that the decision of the Court as to such facts will control in the disposition of the claim of Midwestern.

For all purposes unless otherwise indicated, the facts found by the Court are those existing as of December 31, 1960, the last year involved in this suit.

Tenneco is and has been engaged in the business of purchasing, transporting via pipeline, and selling natural gas in interstate commerce to utility companies for resale and directly to industries for their own use; and is a natural gas company as defined in the Natural Gas Act and subject to the jurisdiction of the Federal Power Commission.

Tenneco uses a number of large diameter (24 inch to 30 inch) long distance pipelines ("mainlines"), together with an integrated network of gathering and latteral lines, compressor stations, meter devices and stations and related buildings and equipment ("the transmission system").

The mainlines run from sources of supply, principally in Texas and Louisiana, to natural gas marketing areas, principally in the Northeastern section of the United States. As of December 31, 1960, Tenneco had constructed approximately 8,524 miles of mainlines at a total cost of $713,527,731.

Tenneco's initial transmission system (the "100 series") was comprised of a mainline running from south Texas into West Virginia. Its second series of mainlines extended its mainlines from West Virginia into Massachusetts. Its third series of mainlines (the "300 series") extended its mainlines from northern Pennsylvania into New York. A fourth series of mainlines (the "800 series") extended from gas gathering areas running from south Texas into southern Louisiana and tied into the earlier constructed mainlines in north-ern Tennessee. A fifth series of mainlines (the "500 series") extended from gas gathering areas running from southwestern Louisiana to the Mississippi River Delta region south of New Orleans, and from such gathering areas northeasterly across Mississippi to tie into the earlier constructed mainlines in northern Tennessee.

Natural gas is transported in these mainlines by compression which causes it to move from the point of higher pressure to a lower pressure. Friction slows movement and causes the pressure of the gas to decrease. To restore compression, compressor stations are located along the mainlines at periodic intervals of approximately 90 miles and are tied into the mainlines by valves ("mainline valves"). Tenneco's mainlines comprising each of mainline systems are tied together by such mainline valves at intervals of approximately 15 miles.

Tenneco has from the inception of its business, operated its mainlines at their full rated capacity in order to derive the greatest possible revenues therefrom, and to maintain the transportation cost of a unit of gas at the lowest possible level. Tenneco will not willingly permit any break in the throughput capacity of its mainlines except as a result of some emergency not affecting any substantial distance along a mainline.

For purposes of analysis, Tenneco's mainlines may be classified as either primary lines or loop lines. A primary line is the first mainline laid from one geographical point to another. A loop line is a mainline which ties into two or more mainline valves of an existing primary line. A loop line is placed in service in relatively short discontinuous sections constructed from time to time as requirements for additional gas transmission capacity are experienced. For safety reasons, a loop line is generally located at least 50 feet from an existing primary line. Moreover, because of topography, technological developments, and other factors affecting the economics of pipeline construction, loop lines most frequently spread apart and

then come back together, and are often as far away as a quarter of a mile from an existing mainline. Loop lines usually are not laid parallel to an existing line for any appreciable distance. As of December 31, 1960, Tenneco had constructed two loop lines over substantially the entirety of the area traversed by its 100 series, a third loop line over the greater part of the 100 series, and a fourth loop line over a 195-mile section of the 100 series. Two loop lines had been constructed over more than one-fourth of the distance of the 200 series.

The construction of loop lines is the standard method used by Tenneco in increasing its gas delivery capability, and in the past Tenneco has looped its lines primarily to increase the gas throughput capacity. However, the evidence also shows that upon the expiration of the useful life (whether for reason of deterioration, required increase in tensile strength of line because of change in population density, or other reason) of any substantial segment of an existing mainline, Tenneco will replace the gas delivery capacity of such portion by looping the old line with a new line and then abandoning the old line in place. Although it is physically possible to remove the pipe from an existing line and lay new pipe in the same trench, this is not done except to make emergency repairs to short segments of Tenneco's lines. The reason for this is threefold: (a) First, the construction cost involved in removing the old pipe and relaying the new pipe in the same ditch is more expensive than looping the old line with a new line; (b) second, the developments in the technology of pipeline construction and changes in population and the use of the land since the first line was laid and other facts often make it impractical to remove the old line and lay a new line in the same trench; and (c) most importantly, the removing of the old pipe and laying a new pipe in the same trench would result in an extended interruption in the transmission of Tenneco's gas deliverability which at best would result in an economically prohibitive loss of revenue and in some cases would make it impossible for Tenneco to fulfill its contractual requirements for the supply of gas.

For depreciation purposes, Tenneco has maintained a single composite account for its transmission system. For all years up to and including the years involved in this suit, the Government has consented to and approved the use of Tenneco's composite method of computing depreciation, but the Commissioner of Internal Revenue has continually held that the portion of Tenneco's investment in its mainlines which Tenneco has classified as right-of-way costs must be excluded from such account and is not otherwise entitled to an allowance for depreciation or amortization. For the years 1959 and 1960 the average composite economic life for tax purposes was 28½ years, and such average economic life was claimed by Tenneco and accepted by the Commissioner upon the examination of Tenneco's United States income tax returns for such years.

The different categories of expense in dispute here are: (a) Right-of-way consideration, (b) other acquisition costs, (c) damage payments, (d) other damage costs, (e) surveying costs, (f) clearing costs, (g) grading costs, and (h) all other construction costs. The nature of each of these respective categories of cost are discussed below. To place a loop line in service at any time, Tenneco has re-incurred each of these respective categories of cost in substantially the same relative amounts.

Each of such categories of cost are ordinarily and necessarily incurred in order to place a particular mainline in service. Such costs are incurred for the purpose of constructing a particular mainline but such costs have a benefit to Tenneco over the useful life of the pipeline.

### Right-of-Way Consideration

In order to build a mainline, Tenneco must first obtain the right to lay the line over and through land owned by others. Generally, this right is obtained by acquiring from each of the landown-

ers involved a contractual easement or right-of-way agreement. However, in the relatively few cases in which this is not possible, Tenneco has had to acquire such right by exercising its power of condemnation. Although the form of easement obtained from the various landowners varies considerably in minor details, they may be classified generally as either single line easements or multiple line easements.

A single line easement gives Tenneco the right upon the payment of agreed upon consideration to lay, construct, maintain, operate, alter, replace, and remove (collectively "lay") a single pipeline across grantor's land. A multiple line easement gives Tenneco the legal right, upon the payment of additional consideration for each additional line to lay one or more additional lines.

Except in relatively few instances, Tenneco's mainlines traverse sparsely settled agricultural or open land in an attempt to lessen any interference with the landowners' use of the land. The typical consideration paid the landowner is a specified sum for each rod traversed by the line. Within a given locality at a given time, the roddage fee is generally the same, but the roddage cost has varied from earlier years to later years and from one section of the country to other sections of the country, from as little as $1 per rod to as much as $5 per rod. However, in areas where the existence of the line will restrict the use of the land by the owner, such as in residential subdivisions or commercial timber growing areas, Tenneco is forced to pay a considerably higher consideration to the landowner to compensate him for this loss of utility. Although compensation for such use is sometimes referred to as damages, payments of this type are classified by Tenneco as right-of-way consideration on its books.

Right-of-way easements are acquired by Tenneco only in connection with the imminently proposed construction of a particular mainline. The costs incurred for such rights are incurred solely for the purpose of constructing a particular mainline. As a matter of course, whenever Tenneco has been required to obtain an easement to construct a line, it has first sought to obtain a multiple line easement. However, Tenneco will readily accept single line easements and has not paid and will not pay any additional consideration for multiple line easements. The reason this is so is (a) at the time of constructing a particular line, Tenneco does not know whether any loop lines will be needed; (b) even where loop lines are constructed, changes in the direction of the line and other factors often preclude reuse of the multiple line rights; and (c) even on loop lines where Tenneco has been able to exercise its multiple line rights, the per rod right-of-way consideration paid to landowners in the construction of such line is substantially the same as that paid where all new easements are obtained.

Of the total of 24,630 rights-of-way used by Tenneco in the construction and placing in service of its mainlines, 8,624 have resulted from the use of single line easements, 13,965 have resulted from the original use of easements granting multiple line rights, and only 2,041 have resulted from the reuse of such easements granting multiple line rights.

*Other Acquisition Costs*

These costs include all of the other costs and expenses incurred by Tenneco incident to the acquisition of its easements, such as, salaries and travel expenses of employees and land agents who deal with the landowners, legal fees paid for title work and condemnation suits, abstract and recording fees, and other miscellaneous expenses. The record shows that these costs are incurred whenever a mainline is constructed, whether a primary or a loop line, and that while the per rod cost has increased substantially over the years, so have all other categories of costs, so that as a percentage of total construction costs, they have remained substantially the same. Moreover, there is no discernible difference in the amount of percentage of costs as between primary lines and loop lines.

### Damage Payments

These payments are generally amounts paid to landowners for injury for what the landowners claim to be injuries to their properties as a result of the construction of the line, and such payments are in essence additional amounts paid by Tenneco to acquire the easement. The injuries claimed by the landowners and those usually involved are the destruction of growing crops and standing timber, and temporary disruption of the fertility of the land by burying the top soil. After the line has been constructed, the landowner is again permitted to refertilize the soil and grow crops, and such damages do not generally result in permanent injury to the land. If for any reason it is necessary to repair or replace the line, such physical damage costs are again recurred.

### Other Damage Costs

These costs are the legal fees, salaries, and expenses of agents and others incurred in settling the damage claims of the various landowners.

In the great majority of the cases, the agreement requires the parties to, and in fact the parties customarily do, determine the amount of damages after the line has been laid and the damages can be ascertained and paid with precision. However, in some cases where the landowner demands the entirety of all amounts to be paid in advance, damages are sometimes paid prior to construction, with the provision that any damages to Tenneco's property lying beyond the limits of the right-of-way will be paid upon completion of the line.

### Surveying Costs

These costs are those incurred by Tenneco in surveying the land to determine the most practical line along which to lay the pipeline and physically to stake out such line along the right-of-way. This survey must be done for each mainline in order to determine the exact length of the line, the amount of pipe necessary for its completion and to permit the pipeline contractor to build the line.

### Clearing Costs

These costs normally include the cutting of fences, the felling of any timber standing along the right-of-way, and the construction of temporary crossings over ravines and low spots to permit trucks, tractors, and bulldozers to enter and traverse the right-of-way. The land is cleared only to the width necessary to permit the economic construction of a single pipeline. Because of the distance which is maintained between loop lines, the amount of land cleared for construction of one pipeline is seldom of any material benefit in the construction of any subsequent line.

### Grading Costs

These are the costs incurred by the contractor in grading the land to prepare a bed for digging the trench. Large diameter pipe used in natural gas construction can be bent only to a limited extent and in order to use the high speed ditch digging machines, it is sometimes necessary first to grade the land so that its elevation conforms precisely to the line which the pipe is to follow. This involves both cutting down to grade elevation and grading the sides off mountains. When the pipe has been laid, the land is restored to its natural contours which existed prior to the construction so that the same grading costs would be involved in any repair or replacement of an existing line as well as the construction of any additional line.

### All Other Construction Costs

These costs represent all other costs incurred by Tenneco in constructing the line. In addition to the cost of the pipe and other materials, it involved the cost incurred in transporting the pipe to the site, digging the ditch to put the pipeline in, bending the pipe to the desired amount, welding the pipe and coating it with protective material, laying the pipe in the ditch, filling the trench, and then restoring the land disturbed during the grading operations. These various steps are lumped together into one category for purposes of this suit because the Government concedes that all of such

costs are properly treated as component costs of the pipe.

None of the categories of costs discussed above have any material value to Tenneco apart from association with the particular mainline for the construction of which they were incurred and to which they relate. These costs are an essential part of the costs of the construction of the line. Such costs constitute an integral part of Tenneco's investment in its pipeline systems and properly should be depreciated as a part thereof.

Accordingly, this Court concludes as follows as to the issues presented in this case:

Tenneco's right-of-way costs are depreciable over the life of the particular mainline for which they were incurred and to which they relate. Badger Pipeline Company v. United States, 401 F.2d 799, 185 Ct.Cl. 547 (1968); Texas-New Mexico Pipeline Company v. United States, 401 F.2d 796, 185 Ct.Cl. 570 (1968); Connecticut Light & Power Company v. United States, 368 F.2d 233, 177 Ct.Cl. 395 (1966); Union Electric Co. v. Commissioner of Internal Revenue 177 F.2d 269 (8th Cir. 1949); Shell Pipeline Corporation v. United States, 267 F.Supp. 1014 (D.C.Tex.1967); Panhandle Eastern Pipeline Company v. United States, 687 CCH 7925 (June 18, 1968).

Since Tenneco's total investment in its transmission system, including its mainline, has been placed into one composite account for depreciation purposes, Tenneco's right-of-way costs should be added to the adjusted basis of such composite account and depreciated on the average composite life of 28½ years. Connecticut Light & Power Company v. United States, 368 F.2d 233, 177 Ct.Cl. 395 (1966).

Although an easement is at law a separate asset, this Court concludes for tax purposes it "will more accurately reflect the economic realities of the situation" to capitalize the right-of-way costs as part of the construction cost of the mainline for which they were incurred and to which they relate. Willow Terrace Development Company v. Commissioner, 345 F.2d 933, 938 (5th Cir. 1965); Connecticut Light and Power Company v. United States, 368 F.2d 233, 244, 177 Ct.Cl. 395 (1966); Union Electric Co. v. Commissioner of Internal Revenue, 177 F.2d 269 (8th Cir. 1949); Equitable Life Assurance Society v. Commissioner of Internal Revenue, 44 BTA 293 (1941).

The Clerk shall file this Memorandum and Order and furnish copies of same to counsel of record.

Counsel for Tenneco, Inc., shall draft an appropriate judgment, which judgment shall include a computation of the amount of refund to which Tenneco, Inc., is entitled, in accordance with this Memorandum and Order for submission to the Court by March 24, 1969, after first obtaining approval of opposing counsel.