### KANSAS CITY SOUTHERN RY. CO. et al. v. UNITED STATES.

#### No. 49883.

United States Court of Claims.

Decided June 2, 1953.

———◆———

Dean P. Kimball, Washington, D. C. (Jos. R. Brown, Kansas City, Mo., and Covington & Burling, Washington, D. C., on the briefs), for the plaintiffs.

J. W. Hussey, Washington, D. C., H. Brian Holland, Asst. Atty. Gen. (Andrew D. Sharpe, Washington, D. C., was on the brief), for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge, delivered the opinion of the court.

The Louisiana & Arkansas Railway Company is a wholly owned subsidiary of the Kansas City Southern Railway Company. The latter company therefore included the income of the former in a consolidated income tax return which it filed for its affiliated group for the year 1940. It and the subsidiary here seek to recover some of the taxes paid with that return, and which were attributable to the income of the subsidiary. The basis for the claim is that an expenditure in 1940 of the Louisiana & Arkansas Railway Company should have been but was not taken as a deduction in the tax return for that year. That company spent $116,548.77 for driving poles in its road bed to correct the effects of water pockets. If this work was in the nature of repairs and maintenance, its cost was deductible and the plaintiffs are entitled to recover. If it was in the nature of a capital improvement, they are not so entitled.

Water pockets developed from time to time in the subgrade of the railroad track at various locations. The ballast, the gravel or crushed stone bed in which the ties lie, is, of course, pervious to rain water. If the nature of the soil is such that the water becomes trapped in the subgrade, the subgrade becomes and remains soft and yielding, and the pressure of trains upon the ties and ballast depresses them and makes the operation of trains over the tracks at economical speeds dangerous.

The pole-driving method of attack upon the water pocket problem consists of driving wooden poles vertically into the ground at the ends of the ties. The poles are driven four or more feet below the bottom of the water pocket, hence their length depends on the vertical location and depth of the pocket. The poles are about six inches in diameter and are set at intervals of about eighteen inches. They are driven with a drop hammer. The pole-driving process solves the water pocket problem satisfactorily, and is the least expensive of three known methods of solving it. It is thought that when a water pocket is so treated, the beneficial effects will continue for some fifteen years.

Our problem is to determine whether the pole-driving work was maintenance work or capital improvement work. If, at the time of the original construction of the railroad, it had been possible to foresee where the water pockets would appear, and the poles had then been driven, their cost would, of course, have been a capital cost. But the water pockets develop and appear casually, and, as they appear, they present a problem of maintaining an existing completed track in a safe and economical operating condition. If in particular locations it should be found that ordinary railroad ties were subject to extraordinary deterioration because of soil conditions or insects, and the ties were replaced with others of a type which would withstand these attacks better and longer, that replacement would, we think, be maintenance. The fact that the replacements, once made, would be good for many years, would not seem to be significant. When a building or a machine is repaired, it is not unusual that the repaired portion is better than and will outlast the parts that have not yet needed repairs. In the instant

case the railroad track, after the poles were driven, was still just a railroad track, and the parts of it where the poles were driven were no more useful than the other parts which had not needed this work.

As shown in finding 16, the Bureau of Accounts of the Interstate Commerce Commission issued a ruling which seems to' be in accord with the view which we take. The Board of Tax Appeals, now the Tax Court, in Appeal of Illinois Merchants Trust Company, 4 B. T. A. 103, and the Court of Appeals for the Sixth Circuit in C. I. R. v. American Bemberg Corporation, 177 F.2d 200, affirming 10 T. C. 361, made decisions which seem to us to support the view we take. The memorandum decision of the Tax Court in Texas & Pacific Railway Co. v. Commissioner, 1 T. C. M. 863, 1943 P–H T. C. Memorandum Decisions, par. 43165, seems to us to be less persuasive than the other decisions cited above.

The plaintiff is entitled to recover $27,-971.70 with interest as provided by law.

It is so ordered.

JONES, C. J., and HOWELL, WHITAKER and LITTLETON, JJ., concur.