The CONNECTICUT LIGHT AND POWER COMPANY
v.
The UNITED STATES.
No. 455–58.

United States Court of Claims.
Feb. 7, 1962.

N. Barr Miller, Washington, D. C., for plaintiff. J. Marvin Haynes, Joseph H. Sheppard, Arthur H. Adams and Haynes & Miller, Washington, D. C., on the brief.

Philip R. Miller, Washington, D. C., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., for defendant. James P. Garland and Jerome S. Hertz, Washington, D. C., on the brief.

JONES, Chief Judge.

Plaintiff, The Connecticut Light and Power Company, seeks a refund, in an amount to be determined under Rule 38 (c) of the Rules of this court, 28 U.S.C. A. § 38(c), of alleged overpayments of corporate income tax for the years 1952 and 1953.

The material facts have been stipulated by the parties. Plaintiff is, and has been for many years, a Connecticut public utility company engaged in the manufacture and sale of gas and electricity. It is an accrual method taxpayer and files its Federal tax returns on a calendar year basis.

Prior to 1952, the gas portion of plaintiff's business consisted of both the manufacture and distribution of gas at retail, and the purchase, for purposes of resale to other utilities at wholesale, of gas manufactured by an unrelated company. Plaintiff distributed gas in

ten separate areas within the State of Connecticut, and in five of those areas distributed gas manufactured in its own plants while distributing manufactured gas purchased from the unrelated company in the remaining areas. In addition to the five manufacturing plants, plaintiff owned and operated, *inter alia,* 25 gas storage holders, a high pressure transmission line 59.3 miles in length, and 774 miles of gas distribution mains.

Early in 1950, plaintiff's board of directors authorized its officers to take such steps as they deemed necessary to arrange for the purchase and distribution of natural gas when and if that commodity became available within plaintiff's service area. Shortly thereafter, and at the suggestion of the Connecticut Public Utilities Commission, plaintiff intervened in proceedings held before the Federal Power Commission in connection with the application of two interstate pipeline companies for permission to supply natural gas to the New England area. These proceedings ultimately resulted in the granting of permission to both companies to supply natural gas to certain parts of plaintiff's service area. Plaintiff advised the Power Commission that it would be willing to enter into long-term contracts with either, or both, of these companies for the purchase of natural gas since the use of this commodity would result in certain benefits of a substantial nature to it.[1] Plaintiff also indicated to the Power Commission that it would supply straight 1000 B.t.u. natural gas in part of its service area, 660 B.t.u. mixed natural and manufactured gas in other parts of its area, and 528 B.t.u. mixed gas in the remainder of its area.

Plaintiff entered into long-term contracts for the purchase of natural gas with the two interstate pipeline companies during 1952 and 1953. As a result, plaintiff and its subsidiary (to which all gas transmission facilities were transferred on January 2, 1952[2]) converted their business from that of supplying straight manufactured gas to that of supplying straight natural gas in some areas and a mixture of natural and manufactured gas in others.

All heat-generating commodities, including gas, are rated with reference to a unit of measurement known as British thermal unit (B.t.u.). In general, one B.t.u. is that quantity of heat required to raise the temperature of one pound of water one degree Fahrenheit. Prior to 1952, the manufactured gas distributed by plaintiff had a B.t.u. rating of 528. Straight natural gas, on the other hand, has a B.t.u. rating of 1000, and mixed natural and manufactured gas may be so produced as to have within reasonable limits any desired B.t.u. rating equal to or less than straight natural gas.

When plaintiff and its subsidiary undertook to convert their business from that of supplying straight manufactured gas to that of supplying a higher-rated natural or mixed gas, they realized that the conversion would necessitate certain capital expenditures. This was because of the differing physical characteristics and heat-generating qualities between the new and old commodities. Natural gas is both odorless and tasteless, and safety considerations required the installation and use of special odorizing equipment. Also, since natural gas is relatively dry as compared to manufactured gas, moisturizing equipment was required so as to help prolong the life of existing pipeline linings. The organic diaphragms of household gas meters had to be changed so as to prevent their dehydration. Plaintiff's manufacturing plants (including those to be held for standby emergency purposes) had to be converted so as to be able to produce gas of a much higher B.t.u. rating. Additionally, plaintiff and its subsidiary were required to construct lateral transmission lines to connect the interstate natural gas pipelines with their own transmission and distribution facilities

---

1. See finding 6.

2. This fact is of no legal significance insofar as the merits of this case are concerned.

and were required to build new metering stations. Plaintiff and its subsidiary made capital expenditures in the amount of $1,222,144.15 for these purposes during the years 1951–1953. These amounts have been so treated and are not in issue.

Also because the new and old commodities supplied by plaintiff had differing physical characteristics and heat-generating qualities, it became necessary to adjust certain parts of the gas-consuming appliances owned by plaintiff's customers. This was required so that the customers could make safe and efficient use of the new gas. Therefore, in order to effect the adjustment of customers' appliances as expeditiously as possible, plaintiff engaged an unrelated firm to perform this service on plaintiff's behalf. The necessary adjustments were thus completed. During the years 1952 and 1953, the appliances of 43,029 residential customers, 2,216 commercial customers and 210 industrial customers were converted at an average cost of approximately $13 per customer. Plaintiff expended a total of $250,063.11 in 1952, and a total of $346,594.60 in 1953 for the conversion of customers' appliances.

The conversion of household appliances (cookstoves, hot water heaters and furnaces) may be described as follows: (a) The burner ports, which are individually drilled holes in the burner head where combustion occurs, had to be enlarged by an electric drill, or where such ports were rectangular in shape instead of round, replacement of the burner head was necessary; (b) specially designed gas burners had to be replaced; (c) the size of the orifice, which is the opening through which gas flows to the burner, had to be reduced or the orifice replaced in order to insure the correct amount of gas reaching the burner; (d) the primary air shutter had to be adjusted to produce the proper air and gas mixture for correct flame characteristics; (e) leakage around range oven doors had to be reduced to a minimum to prevent the product of combustion from reaching the top burner compartment since this would cause the top burner flame to lift or float off the burner ports; (f) the flueways of appliances, where necessary, had to be enlarged to relieve back pressure on the burner, and (g) leather diaphragms, if any, used on control equipment for appliances had to be replaced with a more suitable material because the natural gas would dehydrate the diaphragms and thus the controls would not function satisfactorily.[3]

In addition to the amounts expended to convert the customers' gas-consuming appliances, as indicated above, plaintiff, also incurred expenses during the years in issue for services of a usual and recurring nature rendered on customers' premises. These expenses included the cost of labor and materials used to inspect and adjust customers' equipment, inspecting premises, testing customers' equipment and investigating and adjusting customers' service complaints. These expenses amounted to $118,431.09 in 1952, and $146,212.36 in 1953.

Plaintiff's books of account, which were maintained in accordance with a uniform system of accounts prescribed by the Connecticut Public Utilities Commission, reflected in an operating account the entire amounts expended by plaintiff during 1952 and 1953 for services, as described above, of a usual and recurring nature rendered on customers' premises. For those same years, however, the operating account did not reflect the entire amounts expended by plaintiff for the conversion of customers' appliances for use with natural gas or higher-rated mixed gas. In each year, the operating account reflected the deduction of 52 percent of the actual amounts of such expenditures and, beginning with the year 1953, 10 percent of the balance was deducted annually. This procedure was required by the Connecticut Public Utilities Commission so that plaintiff's op-

3. See finding 17(b) for details concerning the conversion of industrial gas-consuming appliances.

erating income for 1952 and 1953, which had a direct effect upon the gas rates it was permitted to charge, would not be distorted by the entire amounts of the conversion costs for those years.

Plaintiff deducted, as ordinary and necessary business expenses, the total expenditures made in 1952 and 1953 for the conversion of customers' appliances for use with natural gas in its Federal income tax returns for those years. It also deducted, on the same basis, the expenditures made in those years for services of a usual and recurring nature performed on customers' premises. The deductibility of these latter expenditures has not been questioned and is not now in issue.

Upon audit of plaintiff's returns for 1952 and 1953, the Commissioner of Internal Revenue disallowed, in part, the claimed deductions for the conversion costs on the ground that, although "necessary," they were not "ordinary" within the meaning of the applicable provision of the Internal Revenue Code of 1939. Rather, he determined that these expenditures were capital in nature and should be amortized over a 10-year period.

After having complied with all procedural prerequisites, plaintiff instituted this action to recover the payments it made in satisfaction of the deficiencies assessed as a result of the partial disallowance of the claimed deductions.

The complex factual pattern detailed above raises but a single issue for our determination: whether the costs of converting customers' gas-consuming appliances for use with natural gas and higher-rated mixed gas are ordinary and necessary business expenses to be deducted in full in the years when incurred.

Before resolving this issue, it should be noted that we recognize the presumptive correctness of the Commissioner's determination against plaintiff. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933). Also, neither we nor the Commissioner are bound by the accounting treatment prescribed for these expenditures by the Connecticut Public Utilities Commission. Old Colony R. R. Co. v. Commissioner, 284 U.S. 552, 562, 52 S.Ct. 211, 76 L.Ed. 484 (1932).

Section 23(a) (1) (A) of the Internal Revenue Code of 1939, 26 U.S.C. (I.R.C. 1939) § 23(a) (1) (A) (1952 Ed.), provides the requisite statutory authorization for the deduction from gross income of ordinary and necessary business expenses. That section governs this suit and it reads, in pertinent part, as follows:

"§ 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

"(a) Expenses.

"(1) Trade or business expenses.

"(A) In general.

"All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *."

The 1939 Code does not define specifically what is meant by ordinary and necessary business expenses. However, section 24(a) (2), 26 U.S.C. (I.R.C.1939) § 24(a) (2) (1952 Ed.), explicitly disallows as deductions from gross income certain expenditures of a capital nature. This latter section provides insofar as is pertinent, that:

"§ 24. Items not deductible—(a) General rule.

"In computing net income no deduction shall in any case be allowed in respect of—

" *   *   *   *   *   *

"(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate * * *."

Also of some significance to this suit, insofar as it attempts to distinguish between expenses currently deductible from gross income and those not so deductible as being in the nature of capital outlays,

is Treasury Regulations 118 (1953), which provides:

"§ 39.23(a)—4 Repairs.—The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, should be charged against the depreciation reserve if such account is kept."

Plaintiff asserts that the expenditures here involved were deductible when incurred as ordinary and necessary business expenses within the meaning of section 23(a) (1) (A). This is so, says plaintiff, because the expenditures were necessary and in accord with sound business practice, because they were made to protect or retain its existing business, and because neither it nor its customers acquired any new assets as a result of the expenditures.

Defendant admits that these expenditures may have been "necessary." However, it vigorously denies that they were "ordinary" within the meaning of the applicable provision of the 1939 Code. On the contrary, it is defendant's position that these disbursements were capital outlays within the meaning of section 24(a) (2) in that they were made to effect the improvement and adaptation of capital assets to a different use, they increased the value of capital assets, they were made as an integral part of plaintiff's own capital conversion program, and they were made to effect improvements of a relatively permanent nature.

The statutory provisions we have quoted above do not in themselves, of course, dispose of the issue here involved. Their terminology is much too broad for that purpose. Nonetheless, we are not without guides to our decision, for the cases attempting to establish a meaningful distinction between ordinary and necessary business expenses and capital outlays are legion. We will not attempt to recapitulate them here, however, for we have had occasion in the past to treat rather extensively the considerations involved in the classification problem. Canton Cotton Mills v. United States, 119 Ct.Cl. 24, 94 F.Supp. 561 (1951); RKO Theatres, Inc. v. United States, 143 Ct.Cl. 39, 163 F.Supp. 598 (1958). Those decisions, and the cases cited therein, set forth the relevant criteria.

■■■ Thus, it may be said that disbursements made for the incidental repair of property, because of ordinary wear and tear and trifling accidental losses, would clearly be deductible under section 23(a) (1) (A). This is true even though the repairs may involve benefits which endure longer than a single year. Moreover, an expense meeting the requirements of section 23(a) (1) (A) does not become a capital expenditure simply because of some relation in time or circumstance to an admittedly capital expenditure. Addressograph-Multigraph Corp., et al., 4 CCH Tax Ct. Mem. 147 (1945). The nonrecurring nature of the disbursement does not preclude deductibility; nor does its mere dollar amount. Expenditures made in accordance with trade usages and the requirements of good business practice may be deducted, even though there is no legal obligation to make them. Similarly, expenditures made to retain or protect and promote the normal continuance of an established business are deductible, as are expenditures made to retain customer good will.

■■ On the other hand, disbursements made to acquire new assets, be they tangible or intangible, fall squarely within section 24(a) (2) and are nondeductible. This same tax treatment obtains when expenditures are made for replacements, alterations, improvements or additions which prolong the life of the property,

increase its value, or make it adaptable to a different use.

Adam C. Croff, 26 PH Tax Ct. Mem. 614 (1957), is a case analogous to the one at issue. There, the taxpayer replaced the ammonia refrigeration unit in his ice cream maker with a freon refrigeration unit. This was done because ammonia was difficult to obtain and prohibitive in cost. The Tax Court held that the cost incurred in making the conversion was for the purpose of keeping the machinery in an ordinarily efficient condition and was properly deductible as an ordinary and necessary business expense.

Our consideration of the facts in this case, in the light of the above authorities, leads us to conclude that plaintiff has sustained its burden of disproving the presumptive correctness of the Commissioner's determination. It is apparent that neither plaintiff nor its customers acquired any new assets as a result of the conversion expenditures. It appears to us, rather, that their net effect was to enable plaintiff to retain precisely the same privilege of supplying gas to its customers, for as long as they desired, as it had previously.

After all, it was still the choice of the customer as to whether he would continue to use or discontinue using plaintiff's gas. The facilities involved here were and remained the property of the customer. The repairs were an essential service operation.

Similarly, we do not feel that the expenditures increased the value, adapted to a different use, or prolonged the useful life of the appliances to such an extent as to fall within the concept of capital expenditure. No such increase in value is discernible from the record apart from that which would naturally obtain from any ordinary repairs to property. Nor is there any indication that the expenditures prolonged the useful life of the appliances by as much as a single day. The general thrust of the conversion program would seem to be that the relatively minor adjustments made to these appliances, at a relatively insubstantial cost, merely permitted them to function in the same manner and for the same purposes as before. Thus, subsequent to the adjustments, they still operated by gas, albeit gas of a different type, to provide heat for cooking, to make hot water available, and to provide warmth. We do not believe this is what the cases mean by "adaptable to a different use" in the context of capital expenditures.

We incline to the view that these expenditures more closely resemble ordinary repair costs which, in the words of section 39.23(a)–4 of Treasury Regulations 118, kept the appliances in their "ordinarily efficient operating condition." This result is in harmony with the Tax Court's decision in Adam C. Croff, supra, which also involved a change in operative element.

We likewise feel that the expenditures are more analogous to the costs of services of a usual and recurring nature performed on customers' premises than they are to, for example, the costs of installing safety equipment as in the RKO Theatres, Inc., case, supra. Defendant has not questioned the deductibility of the former as an ordinary and necessary business expense. The fact that the expenditures were made in conjunction with plaintiff's own admittedly capital conversion program does not, in our view, compel a contrary result, particularly in the light of the Addressograph-Multigraph Corp., et al. case, supra.

It is also reasonable to say that these expenditures were compelled by sound business practice to protect or retain plaintiff's existing business. Consider the alternatives available to plaintiff, in addition to the one actually pursued, once it had determined to change the type of fuel supplied to its customers. It could either have required them to see to the adjustments at their own risk and expense or permitted them to use their appliances without adjustment, but inefficiently and at a substantial safety hazard. Either alternative, we submit, could easily have resulted in the loss of business or at least some of the good will plaintiff had acquired in prior years.

The cases agree that expenditures made to avoid such results may be deducted under section 23(a) (1) (A). Moreover, it would appear that the course of action which plaintiff did follow is not at all extraordinary in the industry. Defendant itself has cited to us, in oral argument, seven instances when the same course of action was undertaken by other public utility companies.

In this competitive, fast-moving age there is no such thing as industrial standstill. This is especially true when natural gas becomes available to replace the artificial man-made commodity. Both serve the same purpose. But natural gas is made in Nature's laboratory, by a secret process which no man knows and no man as yet has been able to duplicate.

In view of the foregoing, it is our opinion, and we so hold, that on balance, the expenditures in question more closely resemble ordinary repair expenses or expenses made to retain or protect an existing business than they do capital outlays. Therefore, they fall within the purview of section 23(a) (1) (A) of the 1939 Code and may be deducted from gross income in the years when incurred.

Judgment will be entered for the plaintiff with the amount of recovery to be determined pursuant to Rule 38(c).

It is so ordered.

REED, Justice (Ret.), sitting by designation, and DURFEE and LARAMORE, Judges, concur.

WHITAKER, Judge (dissenting).

There is much to be said for the opinion of the majority, but I am inclined to think that the expenditures for the adaptation of customers' appliances to the use of natural gas are not deductible as ordinary and necessary business expenses for this reason:

The expenditures plaintiff made to convert the equipment in its own plants and pipe lines for the use of natural gas were not ordinary and necessary business expenses, but undoubtedly were capital expenditures. But these capital expenditures were worthless without the conversion also of its customers' appliances. In order to give value to its own equipment, it was required to spend money to convert its customers' appliances. The money so spent should be added to the cost of conversion of its own equipment and deducted, by way of depreciation or amortization, over a period of years, and not wholly in the year expended. Cf. Teitelbaum v. Commissioner, 7 Cir., 294 F.2d 541.