**NIAGARA MOHAWK POWER CORPORATION**

v.

**The UNITED STATES.**

No. 368–72.

United States Court of Claims.

July 8, 1977.

**1380**

James W. Benkard, New York City, for plaintiff; Wallace S. Jones, New York City, attorney of record; H. Reed Wasson and Davis, Polk & Wardwell, New York City, of counsel.

Herbert Grossman, Washington, D. C., with whom was Acting Asst. Atty. Gen. Myron C. Baum, Washington, D. C., for defendant; Donald H. Olson, Washington, D. C., of counsel.

Before DURFEE, Senior Judge, and NICHOLS and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Louis Spector, filed September 16, 1976, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth *, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c).

## OPINION OF TRIAL JUDGE

■ SPECTOR, Trial Judge: This tax refund suit seeks recovery of $186,562.82 [1] paid under protest in response to a deficiency assessment on plaintiff's 1965 income tax return. Presented is the issue of whether certain expenditures in the course of its business activities may be expensed and deducted by the taxpayer in that tax year

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed September 16, 1976, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. Plus $55,864.06 in assessed interest, and statutory interest.

as "ordinary and necessary expenses paid * * * in carrying on any trade or business * * *." (Int.Rev. Code 1954, § 162), or whether they should, as urged by the Internal Revenue Service, be capitalized and depreciated over a number of tax years as amounts "paid out for new buildings or for permanent improvements or betterments made to increase the value of any property * * *." (Int.Rev. Code 1954, § 263).

In implementation of those Code provisions, Treas.Reg. § 1.162–4 *Repairs,* instructs the taxpayer that the "cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense," provided that such costs are not also capitalized. And Treas. Reg. § 1.263(a)–1(b) adds as a requisite for deductibility, that the expenditure not "adapt property to a new or different use."

Resolution of this not infrequently litigated issue depends on the facts present in a particular case, and their interpretation in prior decisions involving the same or similar facts. By those tests, plaintiff was clearly entitled to expense and currently to deduct the expenditures in question as the costs of ordinary and necessary repairs, and is entitled to recover.

Plaintiff is engaged, *inter alia,* in the business of selling and transporting natural gas to consumers in New York State. It is a utility regulated by both the New York State Public Service Commission and the Federal Power Commission. The gas is transported to its customers through a system of underground pipelines. Between the years 1847 and 1960, plaintiff installed cast iron mains, but toward the end of this period, plaintiff began to use other more modern forms of pipeline, namely steel and plastic, to replace the now obsolete cast iron lines.

Cast iron pipeline is generally constructed in 12-foot lengths, utilizing bell and spigot caulked joints. The joints are formed by packing jute or some other fibrous material tightly between the bell and spigot portions of the joints, and then sealing and protecting the jute with either lead or cement. The integrity of the joint is maintained by the moisture absorbed by jute or other fibrous material.

Prior to the 1930's and the advent of natural gas as a fuel source, plaintiff transported manufactured gas in its pipelines. Manufactured gas, which contains a significant amount of water vapor and light oil, kept plaintiff's pipe joints sufficiently moist and in satisfactory operating condition. Initially in the Syracuse-Oswego Division, and thereafter on a company-wide basis, plaintiff discontinued the use of manufactured gas, and began delivering natural gas. There is a significant difference in the moisture content of manufactured and natural gas. Whereas manufactured gas contains approximately 1,000 pounds of water per million cubic feet, natural gas contains less than 7 pounds of water per million cubic feet.

Following the transition to natural gas, plaintiff discovered that leaks were developing in the caulked pipe joints due to shrinking and crumbling of the jute fiber in the joints. This was an industry-wide phenomenon. It was observed that 5 or 10 years of transporting natural gas in cast iron pipelines was generally sufficient to cause shrinkage in some caulked joints. Other joints were unaffected, since the jute would tend to stay in better condition in joints exposed, for example, to dampness from water that had gotten into a main.

The transition from manufactured to natural gas was not the sole cause of the deterioration of and the leakage from cast iron pipe joints. Several other factors also contributed to deterioration. The most apparent of these were vibration caused by heavier traffic loads on the streets above the pipes, and the contracting effect of low

temperatures, enhanced by the current practice of more thoroughly removing snow which previously served as a natural insulation for the pipes. The deterioration of pipe joints progressed at such a rate that by 1965, 50 percent of the joints which would be exposed incidental to the performance of other work, were discovered to be leaking. At least 80 percent of the number of individual leaks (as distinguished from total volume of leakage) discovered in cast iron mains during the period from 1958 through 1965, originated at caulked pipe joints.

There are at least six basic methods generally employed to repair a leaking bell and spigot joint in a cast iron gas pipeline. These are: (1) attaching a bell joint leak clamp to the joint; (2) recaulking the joint with a fresh mixture of jute or other fibrous material, and lead or cement; (3) application of an epoxy substance to the external or internal face of the joint; (4) sealing the joint internally with Thiokol by manual application to the interior of the joint (*i.e.,* the Fuelling method); (5) sealing the joint internally with Thiokol, by forcing a Thiokol emulsion into the pipe under pressure (*i.e.,* the Con-Seal method); or (6) encasing the joint with a polyethylene sleeve which shrinks to a tight fit when heated.

Plaintiff has over the years used bell joint clamps, epoxy applications and the Fuelling and Con-Seal methods of repair. During the 1960's, plaintiff employed several of the repair techniques above-described, including the leak clamp method, to control leakage. It is the use of the leak clamp method of repair which is at issue in this case.

The clamp consists essentially of a bell ring, a spigot ring, a gasket and bolts connecting the two rings. The gasket is forced into the recess in the bell end of the pipe by the spigot ring as the bolts are tightened, so that the spigot ring and gasket form a seal. The bell ring on the other side of the pipe bell simply provides a means of pulling the spigot ring tight. The installation of leak clamps to repair leaking joints in cast iron pipe is a common and accepted repair method in the gas distribution industry, because it resolves a leakage problem without requiring cessation of gas flow through the line. Once a clamp is installed on a joint, the condition of the caulking in the joint generally has no further effect on leakage, because the clamp's rubber gasket thereafter performs the same function as the caulking in preventing leakage.

Joints repaired with leak clamps sometimes leak again, and require reclamping. This usually occurs when the bolts fastening the clamps have rusted or corroded. The use of defective clamps, or sloppy workmanship, are also responsible for some failures. The degree of rusting or corrosion of clamp bolts varies with soil and moisture conditions. Although such corrosion or rusting is not a frequent occurrence, the company, in 1965, undertook to place mastic, a corrosion retardant, on clamps prior to backfilling, to further alleviate subsequent clamp failures.

It is desired to emphasize in this recital of the facts, that the only clamping costs involved in this case are those which were incurred to repair gas leaks, in response to actual reports of leaks. Moreover, these leak repair costs, the deduction of which is at issue in this case, did not include the cost of the clamp itself, nor the direct cost of installing the clamp. This was because of a special accounting requirement of the State Public Service Commission which appeared to require a different treatment for those particular costs, as later detailed.

It is emphasized that only the costs incurred in repairing leaks are at issue here, because plaintiff also clamped some joints under circumstances unrelated to leak reports, as hereinafter described, and defendant seeks to infer therefrom that there was an established program to clamp all joints on cast iron pipelines. Such an inference

finds no support in the record.[2] It is clear that any reference to "program" in the record refers to the policy and practice of repairing joints in response to leak reports, and the similar policy and practice of clamping joints already exposed incidental to other work.

The primary drawback to the clamp method of leak control, is the expense involved in excavating down to the pipeline in order to install the clamp. That is why plaintiff undertook to clamp all caulked joints which were exposed incidental to other work, whether or not they were in fact leaking. This was a practice which had earlier been confined to the Syracuse-Oswego Division. It was a form of preventive maintenance, since the bulk of the costs attributable to excavation, backfilling, cutting and replacement of paving had already been incurred in performing the other work, which had incidentally exposed the joint. It is again emphasized that none of the costs of clamping these incidentally exposed joints, is involved in this case.

During the tax year at issue, it was plaintiff's policy and practice to treat with cast iron bell and spigot pipe joints in two or three kinds of situations: (1) on joints uncovered in response to leak reports from the general public, or from one of plaintiff's own leak survey crews; (2) on joints exposed for any reason as an incident to other work being performed; and (3) on joints uncovered in advance of paving or repaving of streets, but only where a "bar-hole" test indicated a leakage problem, so that this situation was very closely related to and could be considered as part of (1), above.

Plaintiff's practice of clamping both actually leaking and incidentally exposed joints, was a normal practice for New York utilities in the 1960's because it was an efficient, sensible and economic practice and because it avoided in the case of incidentally exposed joints, a possible reexcavation and additional expense at a later date. When plaintiff received a leak report from the general public, or from one of its own leak survey crews, it would customarily dispatch a repair crew to the site of the reported leak. The repair crew would first test for leakage by means of the aforementioned "bar-holing" procedure, whereby a small diameter bar was driven into the ground in the vicinity of the gas main and a combustible gas indicator was placed at the hole made by the bar. If this procedure indicated a leak was present below, the repair crew would excavate and repair the gas main. The repair crew responding to a leak report would not excavate and expose a joint unless the bar-hole test had given a positive indication of leakage.

In some cities such as Syracuse, plaintiff would receive advance notification of the city's street repaving program. Accordingly, in cases where cast iron pipe with bell and spigot joints were in use underneath a street designated for repaving, plaintiff would bar-hole along the street over such joints. If the bar-hole test over a joint

2. Defendant presented no witnesses at trial, relying on some of the documentary material produced for it in the course of pretrial discovery. One of these is a 1960 document entitled "Long Range Plans for the Maintenance and Construction Projects of the Gas Pipeline System," which details projections of *replacement* and maintenance costs for the ensuing 5-year period, to inform plaintiff's personnel of the priority requirements of the Maintenance and Construction Department and to aid management in its budgetary activities. The document forecast *replacement* of 157 miles of cast iron pipeline and the clamping of 64.8 miles during the 5-year period. Replacement was to be with new steel or plastic pipeline which is less susceptible to breakage or leakage than the more brittle cast iron. The document was a forecast, it dealt only in part with clamping, it was not binding, and it imposed no quotas for line replacement or clamping on any of the company's employees. Since it established no policies, it was not submitted to the board of directors and was reviewed only by the vice-president of operations.

revealed gas leakage, plaintiff would excavate and clamp the joint. If the bar-hole test did not reveal leakage, however, plaintiff would not excavate or clamp the joint. This practice avoided the necessity of breaking through new paving later on to repair a leak which had been covered by the new paving.

There was a substantial increase in the rate of joint clamping in the late 1950's and this increase was attributable to the drying out effect resulting from conversion to natural gas; the policy of clamping joints exposed incidental to other work; increased regulatory pressure to clamp even comparatively minor joint leaks; improvement in leak detection techniques; increased stress on pipe joints from heavier traffic and construction equipment; and a particularly severe winter in 1959 which caused deep frost penetration and damage to the pipes and joints. It is emphasized that in the tax year at issue, plaintiff had no program or policy of systematically clamping all of the joints on any particular cast iron main or segment thereof. Plaintiff imposed no quotas on its field personnel, formal or informal, requiring any particular number of joint clamps to be installed over any given time period.

To show the relatively small number of joints clamped in relation to the total number of joints in the system, plaintiff's gas distribution system on December 31, 1965, included a total of 19,655,209 feet of steel or wrought iron pipe; and 7,837,265 feet of the cast iron pipe involved in this case. The cast iron pipe segments are customarily 12 feet long, and thus cast iron pipe joints occur every 12 feet. Plaintiff's total cast iron pipe footage in 1965 thus contained approximately 650,000 joints. Plaintiff's storeroom records show that in 1965 a total of 4,113 joint clamps were provided by the storerooms to operating personnel in the field. Of that number, a total of 3,445 were for 3-inch, 4-inch or 6-inch diameter pipe. These 3,445 clamps included those which were installed on joints exposed incidental

to other work, and therefore not involved in this case. In 1965, there were 843 instances of leaks which were clamped in response to leak reports. The figure 843 does not represent the total number of leak clamps installed during that year but rather shows the total number of leaks which had been reported, and which resulted in the clamping of one or more joints. Only one clamp was installed on each joint that was clamped.

All gas utilities experience some loss in transporting gas from the point of purchase or production, to the customer's premises. Plaintiff's percentage of unaccounted-for gas varied from 2.8 percent in 1958, down to 1.38 percent in 1963. The substantial decrease in the percentage of unaccounted-for gas from 1958 to 1963 demonstrates the effectiveness of plaintiff's cast iron main maintenance policies, coupled with plaintiff's ongoing main replacement program, as hereinafter described. As indicated by this relatively small and declining amount of gas lost by plaintiff between 1958 and 1963, cast iron bell and spigot pipe is not inherently unsuitable for transporting natural gas. Cast iron pipelines are permissible under all regulatory codes, and thousands of miles of cast iron pipelines are still in service transporting natural gas today. Cast iron bell and spigot pipeline may need more watching than new steel pipe, but it is not hazardous nor otherwise unacceptable for transporting natural gas.

Since approximately 1956, it has been plaintiff's policy to replace existing cast iron pipelines with steel or plastic pipelines, since the latter are more suitable for the transportation of natural gas, are less adversely affected by the relative dryness of the gas, and are generally less susceptible than cast iron pipe to fracture when subjected to beam stress due to soil movement, frost or impact. During the period from 1958 through 1963, plaintiff was retiring

cast iron mains and replacing them with new steel mains at the rate of approximately 50 miles per year.

Prior to the 1960's, a common gas industry estimate of the useful life of cast iron pipeline was approximately 100 years. Plaintiff employed this accepted useful life for computing the depreciation on its cast iron pipelines in the books which it maintained as prescribed by the New York State Public Service Commission. When these gas mains were originally installed, during the era of manufactured gas, the general expectation in the gas industry was that caulked joints would provide satisfactory service for the expected life of the mains, and would not create a significant leakage problem.

Plaintiff's policy of replacement of its cast iron mains with new steel or plastic mains resulted in their retirement prior to the end of their originally anticipated useful lives. Accordingly, plaintiff sought and obtained authorization from the State Public Service Commission to reduce the useful life of cast iron mains from 100 years to 85 years for depreciation purposes. The earlier retirement of cast iron pipe and the resultant reduction in its average useful life from 100 years to 85 years, was a common experience in the gas industry at that time, and provided a more realistic figure.

The leaking of caulked joints in cast iron pipelines played a relatively insignificant role in the determination of whether or not to replace a certain segment of piping. Plaintiff's primary reason for retiring this type of pipe was its inherent brittleness, and its susceptibility to fracture, especially in the case of pipe of small diameter, such as 3-inch, 4-inch or 6-inch. Other factors which were considered in determining whether to replace a certain line were the likelihood that graphitization had occurred on the line, changes in the load requirements for piping in a certain area, and any relocation of piping which might be required by reason of construction activities.

Plaintiff's decision to retire and replace a particular main or portion thereof was not affected by the presence or absence of leak clamps on the mains, and their presence or absence was not a determinant of useful life. In fact, if a particular cast iron main had an especially bad history of joint leakage (and thus a comparatively large number of joints that had been clamped), this would be a factor tending to influence plaintiff to replace the main, rather than to continue it in service. Cast iron pipes which plaintiff has replaced, have had joints clamped prior to their replacement, and clamping was not an alternative to replacement. It was rather an immediate repair, necessary to keep the system functioning in a safe and efficient manner. In contrast, the replacement of a cast iron main with new steel or plastic mains involved a decision by the local supervisor or district superintendent, based generally on factors other than joint leakage. Replacement required specific budgetary approval at higher levels of the company.

The cost of removing used cast iron pipes from the ground and carrying them away would exceed any amount which could be derived from their sale as scrap. Therefore, plaintiff never reused cast iron pipes. When a new steel or plastic pipeline was laid to replace a cast iron pipeline, the cast iron pipeline was simply left in the ground, unless it was necessary to reuse the same trench. Usually, the new pipeline was laid in a new trench, since this was less costly than digging up and removing the old cast iron pipe.

As earlier mentioned, plaintiff did not include the material and labor cost of actually installing the clamp among the expenditures which it collected and deducted for repair of gas leaks. This exception was presumed to be mandated by a Uniform System of Accounts prescribed by the New York State Public Service Commission.

Gas plant instruction 12, paragraph C(1) of this Uniform System of Accounts provides:

When a minor item of property which does not replace a similar item and which is a part of or associated with a retirement unit and will be accounted for and retired together with such unit, and which by itself or together with other similar items makes a substantial addition, is added to the plant, the cost thereof shall be added to the appropriate gas plant account; otherwise the cost of any minor item of property shall be charged to the appropriate maintenance account. *The amount added to gas plant accounts for such minor items shall not however, exceed the additional cost computed at current prices that would have been incurred if the minor items had been installed together with the retirement units to which they are related.* [Emphasis supplied.]

Prior to 1957, plaintiff and its predecessor companies did not interpret the above-quoted reference to "minor items of property" in the above-quoted instruction as being applicable to joint clamps. Therefore, prior to 1957, plaintiff did not charge any clamping expenditures in response to leak reports to any capital or plant account, but rather expensed them as straight repairs in its "Maintenance of Mains" account.

In 1957, following oral discussions with the State Public Service Commission, plaintiff adopted the accounting policy which was being used in 1965. This policy called for only the cost of the joint clamp itself, as well as the cost of the labor and equipment used in the actual installation of the clamp on the joint, to be charged to a capital account. The remainder of the costs, if attributable to a leak report, were charged off as a repair. In other words, when a clamp was installed in response to a leak situation (*i.e.*, a leak report from the public, from the company leak survey crew, or a leak discovered by "bar-hole" testing in ad-

vance of proposed paving or repaving), plaintiff expensed the costs of excavating, backfilling, cutting and replacing pavement and related work in its "Maintenance of Mains" account.

In contrast, when plaintiff installed a clamp on a joint which was exposed incidental to other work (*e.g.*, installation of customer service), it charged the costs of excavating, backfilling, cutting and replacing pavement and related work to the appropriate account for the other work which had prompted the excavation. This was also in accord with the State's Uniform System of Accounts which requires generally that excavation undertaken for a specified purpose be charged to the account reflecting that purpose. With respect to installation of customer services, the Uniform System establishes a separate gas plant account and requires that this account be charged with "the cost installed of service pipes," including items such as "excavation" and "cutting and replacing pavement." The clamping of a cast iron joint incidentally exposed in the course of a service installation would therefore not justify charging the excavation and related costs as maintenance or repair to the "Maintenance of Mains" account, or to any account other than the capital account for that service installation.

Another provision of the Uniform System of Accounts, gas plant instruction 13, required plaintiff to maintain an accounting system by work order. Under this system, a separately numbered work order was issued for each of the company's major projects. All costs which were incurred on that work were collected under the assigned work order number (and in addition posted to the applicable capital, or expense, account). Work order numbers 4774, 4906, 3442, 3443 and 3444 were issued to cover the installation of joint clamps.

Under these work order numbers, plaintiff collected only the amounts which were

charged to the "Maintenance of Mains" account for work done in response to public and company leak reports and work done on joints tested and found to be leaking in advance of paving or repaving of roads. The amounts charged to the work orders covered only costs of excavating and back-filling and any related costs which were incurred in the correction of leaking joints. No charges were made to any of these work order numbers for clamping of joints which had been exposed incidental to other work.

The $423,443.92 disallowance of plaintiff's deduction as ordinary and necessary repairs which is at issue in this case, was computed by the Internal Revenue Service by totalling the amounts charged by plaintiff to the above-described "Maintenance of Mains" account under the above-numbered Work Orders 4774, 4906, 3442, 3443 and 3444. Therefore, the costs at issue in this case were incurred solely in connection with the installation of clamps in response to leak reports and with the installation of clamps on joints which were investigated in advance of paving and repaving, and found to be leaking. They do not include any expenditures associated with clamping of joints which were incidentally exposed in the course of other work, since such costs were neither charged to the "Maintenance of Mains" account, nor were they collected under Work Orders 4774, 4906, 3442, 3443 and 3444. None of the factual circumstances necessary to characterize these repairs as capital improvements, are present in this record.

The repair of leaks by the clamp method did not increase the value of the cast iron pipelines in comparison with their original leak-free condition. The pipelines had no salvage or resale value, and upon retirement they were ordinarily abandoned in place. Their useful life was not prolonged by the repairs, beyond that originally contemplated, and in fact, that useful life was reduced with State Public Service Commission approval. Plaintiff's program for replacement of cast iron mains with new steel or plastic pipelines, usually resulted in their retirement long before the end of the anticipated useful life originally ascribed to them. Nor was repair of leaks by the clamp method a factor in determining when a cast iron main was to be retired. The typical retirement determinants were fractures, graphitization, changes in load requirements or relocation resulting from new construction.

Clamping of joints to remedy leaks did not adapt the cast iron pipelines to a new or different use. It merely permitted them to continue to perform the same function as before, namely, transporting gas to plaintiff's customers. A policy of responding to leak reports by a method of repair common and accepted in the gas industry, certainly does not constitute a systematic program for improvement, rehabilitation or modernization of plaintiff's cast iron pipelines. There was no quota system for the installation of leak clamps and only a minute percentage of the total number of joints in the cast iron system actually required clamping.

A repaired joint obviously represents an "improvement" over a leaking joint, but that is not the test of a nondeductible capital "improvement" within the contemplation of the Code. If that is defendant's contention in this case, it would suggest that no repair is ever deductible.

*Plainfield-Union Water Co. v. Commissioner,*[3] involved a similar set of facts. A water company had been delivering well water through cast iron mains painted internally with tar. When the utility began

---

**3.** 39 T.C. 333 (1962).

to also deliver more acidic river water through the pipelines, an adverse "tuberculation" effect resulted, reducing the carrying capacity of the lines. The taxpayer installed a cement lining to remedy this condition, and was permitted to deduct the costs as a repair, the court holding:

> An expenditure which returns property to the state it was in before the situation prompting the expenditure arose, and which does not make the relevant property more valuable, more useful, or longer-lived, is usually deemed a deductible repair. * * * [4]

There are a number of decisions to the same effect, some of them involving far more extensive and expensive types of repair than were involved here.[5] It is not surprising that these repairs both eliminated an existing defect, and made it less likely that the defect would again occur at that point. That is the usual purpose, and effect, of any repair.

The fact that a clamp installed to remedy a leak, may outlast the pipeline on which it is installed, does not mean that the originally contemplated useful life of the *pipeline* has been thereby extended. As stated by this court in *Kansas City S. Ry.*[6]

* * * When a building or a machine is repaired, it is not unusual that the repaired portion is better than and will outlast the parts that have not yet needed repairs. In the instant case the railroad track, after the poles were driven, was still just a railroad track, and the parts of it where the poles were driven were no more useful than the other parts which had not needed this work.[7]

Nor did the clamping of a leak adapt the pipeline to a new or different use. As stated in the *Chicago, Burlington & Quincy R.R.* case: [8]

* * * The record shows that the erosion which threatened the integrity of plaintiff's embankments "appears casually" at times and places which plaintiff cannot predict and *was due to changed waterflow conditions.* The erosion problems were thus corrected *as they appeared, to protect and maintain the embankments* in a safe operating condition. This is not a case where, at the time of original construction of the embankments, it was possible to foresee and [make] permanent preparation for all contingencies of erosion damage.[9] [Emphasis supplied.]

This court in *Connecticut Light & Power Co. v. United States,*[10] dealt specifically

---

4. 39 T.C. at 337. *See also,* in accord, *Elizabeth Water Co.,* 25 CCH Tax Ct. Mem. 1216 (1966).

5. *Illinois Merchants Trust Co.,* 4 B.T.A. 103 (1926) (replacement of rotted piling supporting a building, with concrete supports, shoring up of a wall, removal of part of ground floor, due to lowering of the water level of a river); *American Bemberg Corp. v. Commissioner,* 10 T.C. 361 (1948), aff'd, 177 F.2d 200 (6th Cir. 1949) (drilling and grouting to stabilize subsidence threatening taxpayer's manufacturing plant); *Kansas City Southern Ry. Co. v. United States,* 112 F.Supp. 164, 125 Ct.Cl. 287 (1953) (driving of wooden piles into the ground at the ends of railroad ties to eliminate the dangers of subsidence caused by water pockets.

6. Note 5, *supra.*

7. 112 F.Supp. at 165–66, 125 Ct.Cl. at 289. In accord, *Chicago, Burlington & Quincy R.R. v. United States,* 455 F.2d 993, 197 Ct.Cl. 264 (1972) (modification of existing culverts, tres-

tles, walls and pipes to alter or divert waterflow which was eroding rail embankments). The court stated on this and other related points: "The *value* and *original service life* of the embankments were not increased by the corrective work done; nor were the embankments adapted to any *new or different use.*" 455 F.2d at 1015, 197 Ct.Cl. at 302. [Emphasis supplied.]

8. Note 7, above.

9. 455 F.2d at 1016, 197 Ct.Cl. at 303. In accord, *Plainsfield-Union Water Co.,* note 3, *supra,* where a change in the type of water being delivered necessitated the repair. See in addition, *National Weeklies, Inc.,* P-H Memo B.T.A. ¶ 41,096 (1941); *Farmers Creamery Co. v. Commissioner,* 14 T.C. 879 (1950).

10. 299 F.2d 259, 156 Ct.Cl. 304 (1962).

with the very same change in technological conditions involved in this case, namely, a conversion from delivery of manufactured to natural gas. In that case, the expenditures at issue were, moreover, more directly and immediately related to the change in those conditions. The utility had deducted as current expenditures the costs of converting customers' appliances for natural gas instead of the previously delivered manufactured gas. In its opinion, this court concluded:

* * * It is apparent that neither plaintiff nor its customers acquired any new assets as a result of the conversion expenditures. It appears to us, rather, that their net effect was to enable plaintiff to retain precisely the same privilege of supplying gas to its customers, for as long as they desired, as it had previously.

* * * * * *

* * * Thus, subsequent to the adjustments, they still operated by gas, albeit gas of a different type, to provide heat for cooking, to make hot water available, and to provide warmth. We do not be-

lieve this is what the cases mean by "adaptable to a different use" in the context of capital expenditures.[11]

Finally, defendant produced no evidence to support its contention that repair of leaks in response to leak reports constituted a systematic capital improvement program. It is clear that no plan to improve or renovate the cast iron main system existed, and that the expenditures at issue were solely for ordinary and necessary repairs. There is no evidence whatever to the contrary. The use of the word "program" in an occasional internal budgetary memorandum or other document refers simply to plaintiff's sound and efficient practice or policy of clamping joints in response to leak reports (and also of clamping joints exposed incidental to other work). The latter are, of course, not even involved in this case.

None of the cases cited by defendant as examples of systematic capital improvement programs bears any factual resemblance to this case.[12] The clamping by plaintiff during the tax year in issue of .6 percent of the joints in its cast iron pipeline, is miniscule by comparison.[13]

11. 299 F.2d at 265, 156 Ct.Cl. at 312, 313. *See also, Adam C. Croff,* 16 CCH Tax Ct. Mem. 721 (1957) allowing current expensing of the costs of replacement of an ammonia refrigeration unit, by a more modern Freon refrigeration unit. This case was relied upon by the court in the *Connecticut Light & Power* decision. Defendant seeks to distinguish the latter case because the alteration expenses were incurred on property of customers, rather than property of the utility; and because the taxpayer capitalized other large expenditures which it incurred on its own property. The distinction offered is without merit. The court in *Connecticut Light & Power* was not dealing with the ownership of the property involved, but with the nature of the expenditures at issue. Moreover, the taxpayer had voluntarily and properly capitalized expenditures in the amount of $1,222,144 on its own system, expenditures which were designed to prolong the life and expand the capacity of that system, and which were of the type traditionally considered to be capital in nature. They were not at issue in the case.

12. *Mountain Fuel Supply Co. v. United States,* 449 F.2d 816 (10th Cir. 1971) (involved the

digging up of 40 miles of gas pipeline, hauling it to a central location, straightening the line, cutting out defective portions, cleaning, sandblasting and spotwelding the remainder, hauling it back and reinstalling it with new coal tar and fabric coating); *United States v. Wehrli,* 400 F.2d 686 (10th Cir. 1968) (involved extensive renovations of an office building for a new lessee, including air conditioning the entire building, tearing down and installing new walls, floors, wiring, plumbing and rest rooms); *Stoeltzing v. Commissioner,* 266 F.2d 374 (3d Cir. 1959) (involved similar extensive building renovation at a cost exceeding by about 200 percent the cost of the building); *Jones v. Commissioner,* 242 F.2d 616 (5th Cir. 1957), is similar.

13. *See* and compare *Oberman Manufacturing Co. v. Commissioner,* 47 T.C. 471 (1967); *Munroe Land Company,* 25 CCH Tax Ct. Mem. 3 (1966); *Midland Empire Packing Co. v. Commissioner,* 14 T.C. 635 (1950); *Buckland v. United States,* 66 F.Supp. 681 (D.Conn.1946), all of which involved, as in this case, the repair of leaks. In each of these cases, the repairs

■ Nor is there any merit to defendant's contention that since installation of the clamp is what counsel characterizes as an "improvement or betterment" under the State's Uniform System of Accounts, such a regulatory characterization requires that the costs at issue in this case must be capitalized.[14] Addressed to the facts in this case, the case relied upon by defendant would require a conclusion directly opposite to that suggested by counsel. The State's Uniform System of Accounts, earlier quoted and italicized, requires that the clamping costs at issue in this case [15] be expensed, and not capitalized. Moreover, "improvement or betterment" are counsel's words.

The State's Uniform System of Accounts does not characterize a "minor item of property" as an "improvement or betterment." Defendant has erred in assuming that the utility accounting treatment prescribed by the state's regulation is identical to the concept of capitalization developed under the federal tax laws, and further that the state's regulation should be applied, contrary to its terms, to the expenditures at issue here.[16]

Plaintiff is entitled to recover, the amount of recovery being reserved for further proceedings under Rule 131(c).[17]

---

were far more comprehensive than here, involving *inter alia,* new structural elements. In each case the court held that the costs were properly deductible as repair expense.

14. Citing *Commissioner v. Idaho Power Co.,* 418 U.S. 1, 15, 94 S.Ct. 2757, 2766, 41 L.Ed.2d 535 (1974). In interpreting 26 U.S.C. § 446(a) and (b) (General Rule for Methods of Accounting), the Court stated:

"Nonetheless, where a taxpayer's generally accepted method of accounting is made compulsory by the regulatory agency *and* that method clearly reflects income, it is almost presumptively controlling of federal income tax consequences." [Emphasis in original.]

15. Note that the actual cost of the clamp and its installation are not at issue in this case.

16. As plaintiff observes, under the tests set forth for deductibility in Code sections 162 and 263, plaintiff could have expensed *all* clamping costs, including the cost of the clamp itself and the direct cost of its installation. Instead, it reconciled these sections with Code section 446(a), which requires that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Defendant's argument would in effect penalize plaintiff's compliance with section 446(a), by suggesting that such compliance thereby nullified its rights under sections 162 and 263. As plaintiff points out, under applica-

ble tax law "the clamp installations were deductible repairs *in toto,* and Defendant cannot bootstrap the excavation costs into 'capital' status simply because Plaintiff failed to claim a deduction for the cost of the clamp itself."

17. Plaintiff's tax return for 1965 showed a liability of $22,547,429.21. It paid taxes for that year in the amount of $23,000,000, the overpayment of $452,570.79 being applied against its 1966 liability. In the 1965 return, deductions at issue here were shown as totalling $428,162.52. Disallowance of these deductions is shown as $423,443.92. The discrepancy is not explained in the record. The deficiency in tax was calculated as follows:

| Deduction disallowed | $423,443.92 |
|---|---|
| Depreciation allowed on said addition to basis | 8,299.50 |
| Net addition to income | . $415,144.42 |
| Additional tax | $199,269.32 |
| Less: Investment tax credit | (12,703.32) |
| Change in foreign tax credit | (3.78) |
| | $186,562.22 |
| Clerical adjustment between § 870 AD's | .60 |
| Deficiency | $186,562.82 |

This refund claim is therefore in the amount of $186,562.82, plus $55,864.06 in assessed interest, together with statutory interest.

## CONCLUSION OF LAW

Upon the trial judge's findings and opinion, which are adopted by the court, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect with the amount of recovery reserved for further proceedings under Rule 131(c).